UNITED STATES of America, Appellee,

v.

Russell REED, James S. Doyle, and Thomas Francis Ryan, Appellants.

Nos. 224, 227 and 228, Dockets 80–1236, 80–1240 and 80–1264.

United States Court of Appeals, Second Circuit.

Argued Oct. 1, 1980.

Decided Jan. 27, 1981.

As Amended April 10, 1981.

John H. Gross, New York City (Randy Paar, Anderson Russell Kill & Olick, P. C., New York City, on the brief), for appellant Reed.

Robert Rosenthal, Mineola, N. Y., for appellant Doyle.

Frank W. Zito, Malverne, N. Y. (Henry J. Kruman, Maffucci, Kruman & Zito, Malverne, N. Y., on the brief), for appellant Ryan.

Carol B. Amon, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., for the E. D. N. Y., Vivian Shevitz, Asst. U.

S. Atty., Brooklyn, N. Y., on the brief), for appellee.

Before LUMBARD, OAKES and NEWMAN, Circuit Judges.

OAKES, Circuit Judge:

Appellants were convicted after a jury trial in the United States District Court for the Eastern District of New York, George C. Pratt, Judge, on one count of securities fraud, three counts of mail fraud, and one count of conspiracy to commit securities and mail fraud. The case arises out of a scheme whereby appellant Reed was able to engage in more than $2 million worth of highly speculative trading through the brokerage house of Shearson Hayden Stone Inc. (Shearson) during an eight-week period without putting up any of his own cash. Reed ostensibly paid for the trades with twelve checks whose total face value exceeded $394,000, but all of which were drawn on accounts with wholly insufficient funds. The scheme was permitted to continue, despite SEC and Shearson in-house rules requiring payment within five days of any given purchase, through the cover-up activities of appellant Ryan, a registered representative at the Shearson branch office in Huntington, New York, and appellant Doyle, the operations manager of that branch. When Reed's account was ultimately sold out, Shearson took a substantial loss.

On appeal Reed, who jumped bail after the jury was drawn and was tried in absentia while a fugitive from justice, argues that he should be released from custody based on his allegation that after the verdict he was illegally abducted from the island of Bimini in the Bahamas and returned to Fort Lauderdale, Florida, where the FBI placed him under arrest. He also claims that the lower court should not have tried him in absentia, that it should have excluded evidence as to his contemporaneous participation in a similar scheme involving another brokerage house, and that it should not have submitted the mail fraud counts to the jury. Doyle and Ryan make certain evidentiary points which, together with Reed's contentions, we discuss below. None of the appellants challenges the sufficiency of the evidence.

FACTS

The facts need not be elaborated at length. Reed engaged in what is known as a "free-riding scheme" by opening three separate brokerage accounts at Shearson in the names of three corporations, on the first two of which he listed himself as corporate principal and on the third of which he used the assumed name Stephen Whitney. He established the three accounts in the names of the International Credilogical Corporation (ICC), the Universal Gym Equipment Corporation (UGE), and Whitney, Stonehill & Lawler (WS&L), on August 24, September 12, and September 26, 1978, respectively.

Ryan, a broker at Shearson, placed the orders on the accounts and Doyle, as operations manager, communicated payment information to the Shearson margin department. Doyle also had responsibility for ensuring that SEC and house regulations regarding timely payments for trades were followed. As checks on the ICC, UGE, or WS&L accounts came in, were deposited, and were returned as drawn on insufficient funds, Doyle would order the checks redeposited. Doyle later claimed that he had verified Reed's checks with several persons at the various banks, but the bank employees he named all turned out to be fictitious. Meanwhile, Reed was buying and selling on margin and purchasing highly speculative stocks and stock options.

Reed did have accounts at each of the four banks upon which the checks were

drawn, but the balances were minimal. For example, Reed deposited five checks in the UGE account drawn on the Canada Trust Company for $10,444, $15,000, $20,000, $39,094, and $20,611, when at the time his balance in that bank totaled only $24.58. And he drew checks in excess of $171,000 on his account at the Bank of America in Puerto Rico, when his total deposit there was only $100. As a result of Doyle's redepositing Reed's checks at Shearson despite this insufficiency of funds, Reed's brokerage accounts continued to show credit for substantial periods of time, giving him the opportunity to have the market move in his favor and to make additional purchases.

A phone call on October 30, 1978, from the vice president of the Bank of America in Puerto Rico finally alerted the Huntington branch manager to this scheme and Shearson's executives took action. For almost a week Reed staved off the inevitable selling out of his accounts with the confidence man's story that he was obtaining a line of credit at one bank or another. Even as the accounts were being sold out, with a loss to Shearson of approximately $379,000, Reed was bragging to Peter Kujawski, a Shearson vice president and lawyer who was investigating the matter, how smart he had been to do what he had done at Shearson, how dumb Shearson had been to let him get away with it, and how stupid Ryan and Doyle had been not to ask for some money "up front" for their participation in the scheme. Contemporaneously, and even after the events underlying the indictment in the present case, Reed was purchasing securities, again with insufficient fund checks, from another brokerage firm, Janney Montgomery Scott Inc. Evidence of this similar conduct was introduced at trial.

Reed did not appear in court on January 31, 1980, the date set for his trial, though he had been present on December 28, 1979, for the selection of the jury. No explanation for his absence was offered and Judge Pratt issued a bench warrant for his arrest. Although the Government was prepared to proceed, and codefendants Doyle and Ryan wanted to begin, Judge Pratt adjourned the trial until February 25, 1980. On that date, when Reed again failed to appear, the trial finally began. The judge, however, declared a mistrial on February 26, when one of the twelve jurors was injured. A new jury was selected and the trial began once more on February 29, 1980. All three defendants were convicted, Reed in absentia.[1]

When Reed was finally arrested on March 25, 1980, and brought before the court, he moved to have his conviction set aside on the ground that the court had erred in trying him in absentia. He also moved to be released from custody and returned to Bimini in the Bahamas, alleging that he had been illegally abducted by agents of the United States government. Reed claimed that he had been living in Bimini, engaging in real estate transactions, when CIA agents enticed him by deceitful means upon a private airplane destined not for Nassau, as he had been told, but for Fort Lauderdale, Florida. According to Reed, the agents made him lie on the floor of the small plane for thirty minutes, hold-

---

1. The sentence imposed on Reed was five years' imprisonment each on the conspiracy count and on one of the mail fraud counts, to run concurrently; two years' imprisonment each on the securities fraud count and on one of the mail fraud counts, to run concurrently, but consecutive to the five-year sentences; five years' imprisonment on the third mail fraud count, sentence suspended and defendant placed on five years' probation to run consecutive to the other sentences; and fines totaling $23,000, consisting of $10,000 each on the conspiracy count and the securities fraud count and $1,000 on each of the mail fraud counts.

Doyle and Ryan were sentenced to concurrent two-year terms of imprisonment on each of the five counts, though all but three months were suspended; and three years' probation.

ing a cocked gun to his head and threatening to blow his brains out. Reed further claimed that when he deplaned these men twisted his arm as they led him across the runway at Fort Lauderdale, where FBI agents were summoned to arrest him. Because of the nature of his arrest, Reed argued that the district court was without jurisdiction to impose sentence on him and should have ordered that he be returned to Bimini.

## DISCUSSION

### I. Reed's Arrest

Reed contends that his "abduction" from Bimini violated both his constitutional rights and international law, and requires us to exercise our supervisory power over the district courts. He bases his claim upon *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974), which involved an Italian citizen who alleged that he had been kidnapped from Uruguay to Brazil where he was tortured and interrogated for seventeen days before being brought to the United States for trial in the Eastern District of New York. We held that this abusive conduct, if it had actually occurred, could not be tolerated without debasing the processes of justice, and that the defendant was entitled to an evidentiary hearing on his abduction claim if he offered some credible proof that the actions against him were taken by or at the direction of United States officials. In *Toscanino* we sought to resolve the conflict between the ninety-year-old teaching of *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), as followed in *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), that the Government's power to prosecute a defendant is not impaired by the illegality of the method by which it acquires control over him, and the doctrine of *Rochin v. California*, 342 U.S. 165, 72

S.Ct. 205, 96 L.Ed. 183 (1952), as extended in various cases involving, for example, illegal search and seizure and entrapment, where due process was held to bar the Government from exploiting its own deliberate lawlessness in bringing the accused to trial. In striking the balance in *Toscanino*, we invoked Justice Brandeis's oft-quoted dissent in *Olmstead v. United States*, 277 U.S. 438, 483–85, 48 S.Ct. 564, 574–75, 72 L.Ed. 944 (1928), admonishing the Government not to engage in lawless behavior in order to secure a conviction.

The district court in the instant case, however, treated *Toscanino* as having been qualified by *United States ex rel. Lujan v. Gengler*, 510 F.2d 62 (2d Cir.), cert. denied, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975). In *Lujan*, agents of the United States had kidnapped the defendant in Bolivia and kept him in custody for six days until he was flown to New York and arrested. We distinguished that case from *Toscanino* on the basis that Lujan had not been subjected to any acts of torture, terror, or custodial interrogation: "Lacking from Lujan's petition is any allegation of that complex of shocking governmental conduct sufficient to convert an abduction which is simply illegal into one which sinks to a violation of due process," *id.* at 66. In *Lujan*, therefore, we followed *Ker* and *Frisbie*. See *Gerstein v. Pugh*, 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975) (reaffirming the rule of *Ker* and *Frisbie*); see also *United States v. Lira*, 515 F.2d 68, 70 (2d Cir.) (*Toscanino* does not apply if alleged mistreatment was not at the hands of representatives of the United States government), cert. denied, 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1975).

The instant case falls on the *Lujan* side of the balance rather than on the *Toscanino* side. While we must assume, for purposes of this appeal, that it was United States government agents who allegedly enticed Reed onto the airplane, and that

they did so under false pretenses and with the use of a revolver and threatening language, the conduct involved was not "gross mistreatment" but rather is little different from the circumstances of an ordinary arrest where officers may use a gun to make sure that the arrestee does not escape. According to Reed's affidavit, the plane was a small one occupied by only two other persons, the pilot and the agent with the gun sitting in the copilot's seat. The amount of force used may well have been necessary. Here, as in *Lujan*, there was none of the "cruel, inhuman and outrageous treatment allegedly suffered by Toscanino," 510 F.2d at 65. Indeed, the coercion was not even as serious as that involved in *Frisbie*, where the Supreme Court declined to vacate the conviction even though the defendant allegedly had been blackjacked before being abducted to another jurisdiction, *see* 342 U.S. at 520, 72 S.Ct. at 510. Accordingly, we hold that the alleged circumstances of Reed's arrest do not sink to the level of a violation of due process.[2]

■ The fact that the United States has an extradition treaty with the Bahamas[3] does not make any difference at all. The Bahamian government has not sought his return or made any protest—nor is it likely to, since Reed is an American citizen. As we pointed out in *Lujan*, absent protest or objection by the offended sovereign, Reed has no standing to raise violation of international law as an issue. 510 F.2d at 67–68; *see Toscanino*, 500 F.2d at 279.

■ Reed argues beyond this, however, that his Fourth Amendment rights were violated, on the theory that any abduction from another country with which we have an extradition treaty is an unreasonable seizure. He also asserts a violation of the Fourth Amendment on the basis of the physical elements involved in the abduction, including the holding of a cocked gun to his head when on the airplane and the wrenching of his arm behind his back at the airport in Fort Lauderdale. We think, however, that these contentions confuse the reasonableness of making the seizure itself with the reasonableness of the place where and the manner in which the seizure is made.

The seizure of Reed was pursuant to an arrest warrant issued with probable cause and therefore "reasonable" for purposes of the Fourth Amendment. As noted above, Reed lacks standing to complain about the fact that he was abducted rather than extradited from the Bahamas. The existence of an extradition treaty provides an individual with certain procedural protections only when he is extradited. And abduction is no more or less objectionable simply because of the existence of an extradition treaty. As for the manner of the seizure, custody obtained by executing an arrest warrant is not invalidated because of the use of excessive force, even though the defendant might have a suit for damages against the government agents involved.

■ Reed finally argues that the district court should have disclaimed jurisdiction, on

2. It should also be noted that the agents' conduct would have been legal had it occurred anywhere in the United States or in any country where the United States exercises extraterritorial jurisdiction, *see* 18 U.S.C. §§ 3041–3042, for Reed, unlike the defendant in *Toscanino*, was a fugitive from justice who had jumped bail, who was the subject of a bench warrant, and who had been sought for some weeks. We do not suggest that this gave the court jurisdiction beyond the statutory realms contemplated

in 18 U.S.C. §§ 3041–3042. We do believe, however, that this case is different from one in which jurisdiction is *initially* obtained by illegal means.

3. Extradition Agreement, Mar. 7 Aug. 17, 1978, United States-Bahamas, T.I.A.S. No. 9185 (exchange of notes continuing application to the Bahamas of Extradition Treaty, Dec. 22, 1931, United States-United Kingdom, 47 Stat. 2122, T.S. No. 849).

the theory that to countenance the actions of the government agents involved here breeds contempt for the law, mocks our stated concern for human rights, and jeopardizes our standing in the international community. Our views on the subject have been set forth in the previous opinions to which we have referred. To be sure we pointed out in *Toscanino* that, irrespective of minimum constitutional standards, we may in a given situation want to exercise our supervisory power to remedy abuses of a district court's process. 500 F.2d at 276; *see Lira*, 515 F.2d at 72–73 (Oakes, J., concurring). But we see no pattern of repeated abductions necessitating exercise of our supervisory power here in the interests of the greater good of preserving respect for law. Appellant, a fugitive from justice with no respect for the law whatsoever, is hardly in a position to urge otherwise.

## II. *Reed's Trial in Absentia*

Reed argues that he should not have been tried in absentia, contending that his constitutional right, as incorporated in Federal Rule of Criminal Procedure 43,[4] to be present at all stages of the trial was violated. However, in both *United States v. Pastor*, 557 F.2d 930 (2d Cir. 1977), and *United States v. Tortora*, 464 F.2d 1202 (2d Cir.), *cert. denied*, 409 U.S. 1063, 93 S.Ct. 554, 34 L.Ed.2d 516 (1972), we held that a defendant's Sixth Amendment rights are not violated when he voluntarily, knowingly, and without justification absents himself from his trial. *See also Taylor v. United States*, 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973) (per curiam).

In *Pastor*, where the trial judge found that the defendant had knowingly and voluntarily failed to appear for the selection of the jury and the commencement of the trial, we held that it was within the judge's discretion to proceed. This conclusion was based on the considerations that in the event of a severance in this multiple-defendant case the Government would have been obligated to try the case twice, the codefendant was entitled to proceed with trial rather than face an indefinite adjournment, the Government's witnesses had been assembled, and the court had arranged its schedule and time for the trial. 557 F.2d at 933–34, 938–39. In *Tortora*, also a multiple-defendant case, there had been previous delays because of difficulty in coordinating the defense attorneys' conflicting schedules and the claims of physical ailments by two of the defendants, the Government's case rested almost exclusively on the testimony of one witness who had already been threatened on numerous occasions, and severance would have added substantially to the burden on the Government. We therefore held that it was within the judge's discretion to proceed with the empaneling of the jury and the trial, in view of the defendant's voluntary and unjustified failure to appear. 464 F.2d at 1208–10.

■ The instant case is a fortiori to *Tortora* and *Pastor*. Although Reed was present for the selection of the jury in December 1979, he failed to appear on the first scheduled trial date, January 31, 1980, and no explanation was given for his absence. The Government had seven witness-

4. Fed.R.Crim.P. 43 provides in relevant part:
   (a) Presence Required
   The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.
   (b) Continued Presence Not Required

The further progress of the trial to and including the return of the verdict shall not be prevented and the defendant shall be considered to have waived his right to be present whenever a defendant, initially present,
   (1) voluntarily absents himself after the trial has commenced (whether or not he has been informed by the court of his obligation to remain during the trial), . . .

es ready to testify; the codefendants were ready to go forward; the jury, which had been drawn and waiting since December, was assembled at the courthouse; there were difficulties in scheduling a new trial date; and the Government had problems in rescheduling appearances by its foreign and out-of-state witnesses. Nevertheless, the court exercised its discretion in Reed's favor and adjourned the proceeding in the hope that he would surrender or be located so as to avoid a trial in absentia. On February 25, the jury and a number of Government witnesses were assembled for the second time and the codefendants were again ready to proceed. Unfortunately, because the two alternates were unable to attend on the rescheduled trial date and the trial therefore commenced with only twelve jurors, when one of the jurors was injured on the evening of the first day of trial, the judge had to declare a mistrial. A new jury was selected and another trial began on February 29, 1980, in Reed's absence. The Government was prepared to present twenty-seven witnesses, several from out of the country, and granting Reed's motion to sever would have meant a second trial with essentially the same evidence. In view of the extraordinary circumstances, the interests of the Government, codefendants, and witnesses, and the court's finding that Reed's absence was voluntary and unjustified, Judge Pratt's commencement of the

trial without Reed was not an abuse of discretion.

### III. The Mail Fraud Counts

Reed makes two claims as to the mail fraud counts—first, that they were multiplicitous, and second, that Shearson's mailing of three of Reed's checks drawn on a Canadian bank to Shearson's Montreal office for collection from the bank, the basis for one of the counts, was neither foreseeable nor done in the ordinary course of business and, hence, not "caused" by him for purposes of 18 U.S.C. § 1341.[5]

The vice in multiplicity of charges is that it may lead to multiple sentences for the same offense and may improperly prejudice a jury by suggesting that a defendant has committed not one but several crimes. *United States v. Carter*, 576 F.2d 1061, 1064 (3d Cir. 1978). A typical multiplicity problem involves a statute which either creates a single offense for an act involving several potential victims, *see, e. g.*, Mann Act, 18 U.S.C. § 2421, or describes several means by which a single offense may be committed, *see, e. g.*, bank robbery statute, 18 U.S.C. § 2113. In either of these instances, to use several counts in charging a violation of the statute may be multiplicitous. *See* 1 C. Wright, *Federal Practice and Procedure* § 142, at 307–08 (1969).[6] But in the instant

---

**5.** 18 U.S.C. § 1341 provides, in relevant part:
Whoever, having devised or intending to devise any scheme or artifice to defraud, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

**6.** An indictment that is multiplicitous is not fatal and does not require dismissal. The defendant may move to have the prosecution elect among the multiplicitous counts, with all but the one elected dismissed. This is a matter for trial court discretion, and is most appropriate when the mere making of the charges would prejudice the defendant with the jury. The principal danger in multiplicity—that the defendant will be given multiple sentences for the same offense—can be remedied at any time by merging the convictions and permitting only a single sentence. *See* 1 C. Wright, *Federal Practice and Procedure* § 145, at 336 (1969).

case, although there was but one set of transactions, we have violations of two distinct statutes, each with different elements. In *United States v. Van Allen*, 28 F.R.D. 329, 343 (S.D.N.Y.1961), a case precisely on point, the court held that it was not improper for the Government to charge that a single act violated both the general mail fraud statute and various fraud provisions of the securities law involving use of the mails. The court noted that "[t]he same transaction may violate two distinct provisions of the same statute or different statutes and be punishable under both as separate substantive crimes." *Id.* at 342. *See also United States v. Dioguardi*, 332 F.Supp. 7, 21–22 (S.D.N.Y.1971). *But see United States v. Henderson*, 386 F.Supp. 1048, 1051–54 (S.D.N.Y.1974).

■ Our case appears even less susceptible than *Van Allen* to the problem of multiplicity because the securities violation here involved section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), on manipulative and deceptive devices used in connection with the purchase or sale of a security, rather than merely the provision of the Securities Act dealing with use of the mails for fraudulent purposes. The basic inquiry is whether each offense charged requires proof of a fact which the other does not. *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *United States v. Morales*, 460 F.Supp. 666, 667 (E.D.N.Y.1978). Here, the mail fraud counts and the securities fraud count contained different elements and each could have stood alone. While use of the postal service naturally was an essential element of the mail fraud counts, use of the mails was not necessary for the securities fraud count since the Government relied on interstate telephone calls made from a hotel in Florida, where Reed was registered, to Ryan at the Shearson office in New York as the jurisdictional element for the securities fraud violation.

■ Moreover, even if the test for multiplicity were held to be whether Congress had intended the conduct referred to in the various counts to constitute separate offenses, *see* 1 C. Wright, *supra*, at 312–13, the indictment here meets that standard as well. The mail fraud and the securities fraud statutes properly exist "side by side." *See Edwards v. United States*, 312 U.S. 473, 483–84, 61 S.Ct. 669, 675, 85 L.Ed. 957 (1941). And it has been said that the mail fraud statute remains an important tool for prosecuting frauds even in those areas where legislation has been passed more directly addressing specific fraudulent conduct. *United States v. Maze*, 414 U.S. 395, 406, 94 S.Ct. 645, 651, 38 L.Ed.2d 603 (1974) (Burger, C. J., dissenting).

Reed cites *United States v. Dixon*, 536 F.2d 1388 (2d Cir. 1976), as authority for the proposition that the mail fraud counts, because they were based on the same conduct as the securities fraud count, served no purpose and therefore should not have been submitted to the jury. But in *Dixon* we dismissed the mail fraud counts not because they were multiplicitous but because the facts simply did not support a prosecution for mail fraud. *Id.* at 1398–1401. Although we never reached the issue of multiplicity, we did note that "cases where mail fraud counts were added to counts for violation of the securities legislation have typically involved schemes having the potential of pecuniary loss to the victims and gain to the perpetrators . . . ." *Id.* at 1399. The instant case involved just this sort of scheme. In short, we do not find multiplicity in the combination of mail fraud and securities law violations in the indictment here so as to have required the trial court to instruct the jury, under *Heflin v. United States*, 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959), and *Milanovich v. United States*, 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961), as explicated in *United States v. Gaddis*, 424 U.S. 544, 550, 96 S.Ct. 1023, 1027, 47 L.Ed.2d 222 (1976), that Reed could

not be separately convicted for securities fraud and mail fraud.

■ Furthermore, as the Supreme Court has recently held in *Albernaz v. United States*, —— U.S. ——, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), when the *Blockburger* test for multiplicity has been satisfied, and there is no evidence of congressional intent to the contrary, authority to impose cumulative penalties is presumed to be intended. Because we find no congressional intent to preclude multiple penalties when a defendant has been convicted of both mail fraud and securities fraud, the policy of lenity is inapplicable here and Reed's sentences and fines on all counts are affirmed.

■ As for Reed's argument that he did not "cause" the mailing of the Canadian checks, the defendant himself need not effectuate the mailing; it is sufficient under the statute[7] that he perform an act "with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–363, 98 L.Ed. 435 (1954). Reed submitted three checks drawn on a Canadian bank to Shearson's Huntington, New York office. It was plainly foreseeable that the checks would be mailed, for the purpose of collection.

## IV. *Evidentiary Points*

■ Reed claims that the trial court erred in permitting the Government to introduce evidence of contemporaneous stock transactions at Janney Montgomery Scott Inc. (Janney), evidence indicating that Reed was also purchasing securities at Janney with checks drawn on bank accounts having insufficient funds. The evidence was offered to prove intent, knowledge, or plan under Federal Rule of Evidence 404(b). Appellants claim that intent to defraud was not an issue. Yet when Government counsel offered to forego introduction of the evidence if Reed's counsel were willing to stipulate to Reed's knowledge and intent, his counsel declined to do so, stating, "I think that's what this whole case is about." Thus, appellants did not take this issue sufficiently out of dispute so as to bar use of the similar act evidence. *See, e. g., United States v. Figueroa*, 618 F.2d 934, 941–42 (2d Cir. 1980); *United States v. Mohel*, 604 F.2d 748, 753–54 (2d Cir. 1979); *United States v. Williams*, 577 F.2d 188, 191 (2d Cir.), *cert. denied*, 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978).

The evidence of the Janney transactions was also admissible to show a common scheme or plan. *See, e. g., United States v. Wexler*, 621 F.2d 1218, 1225–1226 (2d Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 119, 66 L.Ed.2d 48 (1980); *United States v. Arroyo-Angulo*, 580 F.2d 1137, 1149 (2d Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 618, 58 L.Ed.2d 260 (1978). Reed, while trading at Shearson, opened an account at Janney in the same name as that of one of his Shearson accounts, the Universal Gym Equipment Corporation; he purchased stock for which he never paid, by writing bad checks on foreign-based bank accounts to ensure delay in detection; he even used one of the same banks, the Banco de Commerciale in Puerto Rico. To be sure, the trial court admitted this evidence at the conclusion of the Government's case, rather than waiting for the defense to present its case. This was proper, however, not only because evidence of a common scheme or plan served to prove the doing of the criminal act by Reed, *see United States v. Danzey*, 594 F.2d 905, 912–14 (2d Cir.), *cert.*

---

**7.** See note 5 *supra.*

*denied*, 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979), but also because it was already apparent that the issue of whether Reed had intended to execute a scheme to defraud would be contested. Hence the policy behind postponing introduction of similar act evidence on the issue of intent until the defense has presented its case—to avoid prejudice to the defendant if he never really disputes the issue, *see Figueroa*, 618 F.2d at 939–42—was no longer relevant here.

■ In addition, Doyle and Ryan each argue that they were the victims of prejudicial spillover from the introduction of testimony regarding Reed's activities at Janney. But the court carefully gave cautionary instructions which, in light of the fact that no claim was made that Doyle and Ryan had any connection with the similar conduct, we think were adequate to safeguard against impermissible prejudice. *See United States v. DiGeronimo*, 598 F.2d 746, 754 (2d Cir.), *cert. denied*, 444 U.S. 886, 100 S.Ct. 180, 62 L.Ed.2d 117 (1979); *United States v. Rosenwasser*, 550 F.2d 806, 808–09 (2d Cir.), *cert. denied*, 434 U.S. 825, 98 S.Ct. 73, 54 L.Ed.2d 83 (1977). Indeed, Ryan's counsel argued in summation that the Janney evidence supported Ryan's position that he was the victim of a con artist, for the broker at Janney acted in the same way that Ryan did.

■ Doyle claims that the court improperly admitted into evidence a letter from a bank addressed to him and his wife, which was found in his desk as a result of an office search by one of his superiors at Shearson. The letter stated that the Doyles were eight months behind in their mortgage payments and threatened foreclosure proceedings. Doyle objected to the introduction of the letter on hearsay and relevance grounds. However, the letter was admitted for the purpose of showing Doyle's mental state and his motivation for

not abiding by Shearson's rules. It was not admitted to establish that he was in fact eight payments behind in his mortgage but rather to show that he believed he was in financial difficulty and thus had a reason for participating in Reed's scheme. As such the letter was not hearsay; it was not offered to prove the truth of the matter asserted. *See* Fed.R.Evid. 801(c).

Moreover, the court specifically considered the danger of unfair prejudice, *see* Fed.R.Evid. 403, and quite properly found the letter both relevant, because a defendant's belief that he is in financial difficulty is admissible to show motive, and not unduly prejudicial. *See United States v. Polansky*, 418 F.2d 444, 448 (2d Cir. 1969); *United States v. Caci*, 401 F.2d 664, 670 (2d Cir. 1968), *cert. denied*, 394 U.S. 917, 931, 89 S.Ct. 1188, 1201, 22 L.Ed.2d 450, 461 (1969). Doyle relies on *United States v. Mullings*, 364 F.2d 173 (2d Cir. 1966), a case in which the defendant was charged with theft of property, and evidence that he used narcotics and that his take home pay was under $65 per week was offered to show motive. The court there held that though a lack of money may be admissible to prove motive, this particular evidence was inadmissible because "the chain of inferences" with respect to the defendant's need for funds was "too speculative," *id.* at 175, and was outweighed by the prejudicial effect of the evidence of his narcotics addiction, *id.* at 176. Here, in contrast, Doyle was made aware of a specific and serious financial problem, and there is nothing inherently prejudicial about being behind in one's mortgage payments. Therefore the district court properly admitted the letter as evidence of Doyle's motive.

■ Doyle also argues that the court should have excluded certain testimony concerning the meeting he and Reed had with the chairman of the board of Allied Leisure,

a Florida concern engaged in the manufacture of coin-operated amusement machines. Reed introduced Doyle as a future controller of Allied Leisure if Reed were to obtain a controlling interest in the company; and Doyle, in fact, inspected Allied Leisure's books on that occasion. While Doyle now claims that this was hearsay evidence, he did not specifically make this objection at trial, as he should have. *See* Fed.R.Evid. 103(a)(1); *United States v. Hutcher,* 622 F.2d 1083, 1087 (2d Cir. 1980), *cert. denied* —— U.S. ——, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980). But even if the objection had properly been made, the testimony was offered not for the truth of the fact that Doyle was going to be a controller but rather to establish Doyle's state of mind and his close relationship with Reed. In other words, if Doyle thought that he might be controller, then he would have a motive for cooperating with Reed. And the evidence showed that Doyle was in Florida with Reed even while he was telling people at Shearson that he was elsewhere, this just at the time when the Shearson lawyer Kujawski was making his investigation. Thus the testimony in question went to Doyle's motive and was not hearsay.

Any other contentions of the parties are not worthy of further commentary. Judgment affirmed.