UNITED STATES of America

v.

La–Van HAWKINS

No. 04–370–05.

United States District Court,
E.D. Pennsylvania.

March 11, 2005.

Michael A. Schwartz, Richard J. Zack, Robert A. Zauzmer, Joan L. Markman, William B. Carr, Jr., United States Attorney's Office, Philadelphia, PA, for Plaintiff.

Anthony T. Chambers, Detroit, MI, Lewis Myers, Jr., Chicago, IL, Scott Godshall, List & List, Philadelphia, PA, Nathaniel E. Jones, Jr., Jones & Associates, P.C., Baltimore, MD, for Defendant.

## MEMORANDUM

BAYLSON, District Judge.

Defendant La–Van Hawkins ("Hawkins") has filed nine Motions in Limine to exclude evidence which the government has indicated it will offer against him at the trial. Some of the motions are overlapping and some of them depend on the same principles of law. The government filed responses on February 20, 23 and 26, and March 7, 2005. Oral argument was held at the close of Court on February 23, 2005, March 7, 2005 and at other times. All nine of Hawkins' motions summarize the claims against Hawkins in the Indictment and then each motion sets forth the grounds for that motion. Each motion is accompanied by a memorandum of law, which provides legal argument and citations in support of the motion. Hawkins has filed several reply briefs.

### A. *Motions 1–5 and 8*

1. Hawkins' Motion in Limine No. 1 seeks to exclude recorded conversations pursuant to Federal Rules of Evidence 402, 403 and 801(d)(2)(E) (Doc. No. 453). In this motion, Hawkins makes a general attack on all of the recorded conversations and contends that they are inadmissible. Hawkins relies primarily in this and several other Motions in Limine on *United States v. Logan,* 49 F.3d 352 (8th Cir. 1995), where the defendant's conviction was affirmed. The defendant in that case

sought to introduce certain testimony which the court held was properly excluded on both hearsay grounds and also because it was collateral and not relevant. *Logan* is not persuasive authority on any of Hawkins' Motions in Limine.

As an attachment to this motion, Hawkins has filed Exhibit A, under seal, which contains summaries of recorded conversations which the government may use in this trial. The Court concludes that it cannot definitively rule on Hawkins' Motion in Limine No. 1 until the evidence has developed. Hawkins claims that only 21 of the over 400 tape recordings which the government intends to play at trial are introduced in support of the allegations against Defendant Hawkins. The government responds that although Hawkins' voice may only be contained on 21 of these recordings, there is at least one videotaped meeting (Ex. 159) in which Hawkins advocates a transaction which the government alleges is highly relevant to its overall case against Hawkins.

The Court cannot rule in the abstract, and to the extent that Hawkins' Motions in Limine seek to preclude the government from using any recorded conversations in which Hawkins' voice is not heard, it is rejected. As the Court noted in its Memorandum dated February 10, 2005, denying the Omnibus Pretrial Motions of Holck and Umbrell, if the government is successful in showing by a preponderance of the evidence that Hawkins joined the conspiracy at some point, then all statements and acts of other alleged co-conspirators pursuant to and in furtherance of the conspiracy, are admissible against Hawkins, and the jury may consider whether Hawkins should be held responsible for those statements and acts.

2. Although not specifically denominated as Motion No. 2, Hawkins has filed

a Motion for Preliminary Determination of an Existence of a Conspiracy and the Admissibility of Co–Conspirators' Statements Pursuant to F.R.E. 104(a) (Doc. No. 455). The Court will grant this as Motion in Limine No. 2. As the Court has stated specifically, it will hold a hearing under F.R.E. Rule 104(a) at some point during the trial, at which time Hawkins may press the issues raised in this and other motions.

■ 3. Hawkins has filed a Motion to Redact certain portions of recorded conversations because they contain inappropriate language, racial epithets, etc. (Doc. No. 454). This motion will be denoted as Motion No. 3 and is denied. The voir dire of the venire inquired whether any of them would be offended by such language. Several members of the venire who indicated they might be prejudiced by such language were challenged for cause. The presence of obscene language is not sufficient to require the government to redact the recordings to exclude these words. Many of these words are heard nightly on various television stations and in many movie theaters, and are repeated over and over in best-selling novels. In addition, this motion comes too late, on the eve of trial, and it would unnecessarily delay the trial to require the government to redact certain language from the recorded conversations. At the request of any Defendant, the Court will give an appropriate instruction to the jury to ignore such language.

■ 4. Hawkins' Motion in Limine No. 4 seeks to exclude testimony, exhibits and reference to the wedding date of Corey Kemp (Doc. No. 451). This motion relates to allegations that Hawkins committed perjury by his grand jury testimony that he gave Kemp a check for $5,000 as a wedding present, whereas Kemp had been married two years prior. The Court concludes that this evidence is admissible. The government has clarified its position

that it does not have any proof that Hawkins knew, at the precise time he wrote the check, as to Kemp's actual wedding date. However, the government asserts that the fact of Kemp's wedding date does become material and relevant as to proof of the perjury allegation against Hawkins. Thus, this issue may be dealt with by an appropriate instruction at the time the evidence is introduced and/or at the end of the case, and Hawkins' counsel is welcome to make such a suggestion at the appropriate time. However, the motion will be denied.

5. Hawkins' Motion in Limine No. 5 (Doc. No. 452) seeks to exclude comments, testimony and a letter seized from Corey Kemp (Ex. 235). The Court ruled the letter admissible against Kemp, and the Court so instructed the jury when the letter was introduced. Whether it is admissible against Hawkins remains to be determined based on the evidence and other findings as to the alleged conspiracy.

6. Hawkins' Motion in Limine No. 8 (Doc. No. 471) seeks to prohibit the testimony of Janice Davis regarding the meeting at the Waldorf–Astoria. She did not testify about the videotape or even mention Hawkins, and thus this motion will be denied as moot.

### B. *Motions 6, 7 and 9*

Hawkins Motions in Limine No. 6, 7 and 9 are all related (Doc. Nos. 466, 467 and 483). Motion No. 6 seeks to exclude testimony, exhibits or letters regarding Hawkins' financial status and certain of his transactions with Burger King, Pizza Hut and Blockbuster Video. Although Hawkins' Motion in Limine No. 7 specifically seeks to exclude testimony regarding uncharged misconduct relating to exhibits and/or a certain letter dated February 8, 2005 from Blockbuster Video, the government now intends to call a witness for Blockbuster to counter Hawkins' grand

jury testimony that he was a Blockbuster franchisee. Motion No. 9 seeks to exclude evidence of Hawkins' indebtedness to New World Aviation, an operator of charter planes.

Hawkins objects to this evidence because it seeks to bring out evidence as to his unrelated dealings and transactions with fast food franchisors which he claims is not relevant and will be prejudicial as it relates to his personal financial status. He specifically objects to evidence that may allow the jury to know his financial net worth, or lack thereof.

### 1. *Summary of the Government's Evidence and Contentions*

The government asserts that evidence of Hawkins' business transactions and financial status is important to show Hawkins' motive for associating with White, and for wanting to get Kemp on board with Hawkins and White in persuading a third party to conduct business transactions with Hawkins. The government claims that Hawkins' financial situation was precarious and that Hawkins joined the conspiracy because he wanted the connections with White and Kemp, and Kemp's cooperation, so he could close certain financial transactions that would bolster and/or solidify his poor financial situation. The government also asserts this evidence is relevant to Count 38, charging perjury, where Hawkins allegedly lied about material facts, including his business relationships and financial status, before the grand jury.

The Court has had an offer of proof from the government, and has reviewed Ex. 159, the transcript of the conversations at the Waldorf Astoria meeting and the grand jury transcript.

### a. *Alleged Conspiracy and Wire Fraud*

The government first asserts that evidence of Hawkins' financial transactions and financial status is relevant as to his alleged conduct with regard to a third party, Mr. Aslam Kahn, whose company, Falcon Holdings, was the owner of many Church's chicken franchise outlets. The government alleges that Hawkins initially had a plan to try and take over a large national franchisor named AFC Enterprises, but when that failed, wanted to conduct a transaction with Mr. Kahn. It is alleged that Hawkins secured the assistance of White and Kemp, and their attendance with Kahn at a meeting at the Waldorf Astoria Hotel in New York City, to defraud Mr. Kahn. These charges relate to Count 1, charging conspiracy, and also the wire fraud charges in Counts 24–25 of the Indictment.

The government asserts Hawkins wanted to persuade Kahn to enter into financial transactions with Hawkins. The Waldorf discussions would allow a jury to infer that Church's franchise locations would be established in North Philadelphia and that Kemp was induced to and did tell Kahn that City of Philadelphia pension funds might be available to invest in such ventures, as part of neighborhood rehabilitation efforts in North Philadelphia. The jury has already heard evidence from Kemp's superior, Janice Davis, that Kemp had no authority over, indeed nothing to do with, Philadelphia's pension funds. The government claims that notwithstanding this discussion, Hawkins was not really interested in opening Church's restaurants in Philadelphia.

The government also intends to present witnesses from both Pizza Hut and Burger King as part of its proof of Hawkins' financial troubles, to testify that Hawkins and Pizza Hut parted ways through a written agreement executed in June 2003, and that Hawkins and Burger King had a settle-

ment and parted ways during 2002.[1] The evidence would arguably show that Hawkins parted ways with only minor cash payments to Hawkins. During the Waldorf conversation with Kahn, Hawkins does not mention his relationship with Pizza Hut and Burger King, or imply that he still had substantial business relations with them. However, the government asserts it has evidence that Hawkins had previously told Kahn about these connections with Pizza Hut and Burger King.

#### b. *Alleged Perjury*

The second aspect of Hawkins' financial dealings and status relates to Count 38, charging Hawkins with perjury before the grand jury on February 24, 2004. Concerning the four counts of perjury against Hawkins, only one, Count 38, relates to Hawkins' financial status. Hawkins is accused of lying to the grand jury when he testified that he had given White a check for $5,000 with a blank payee line, with which Hawkins believed White intended to make a donation to African American newspapers. The government alleges Hawkins then knew that he gave the check to White with the purpose of acting as a conduit in White's payment of $5,000 to Kemp, and that Hawkins never had any purpose of giving this check for African American newspapers.

Hawkins testified before the grand jury that certain African American newspapers were supporting him in his litigation against Burger King, and this check was intended as a donation to the African American newspapers represented by Ronald White. During his testimony, Hawkins also very briefly mentions his Pizza Hut and Burger King relationships. In response to questions about what happened to an alleged loan of $40,000 in cash to Ronald White, Hawkins testified that he did not recall exactly where he got the $40,000, and volunteered, "I think you already know that I'm a multi-millionaire. So $40,000, you know, I'm sorry that $40,000 just came out of my money." Hawkins then said he had $40,000 in cash in a drawer in his office. The government asserts that this testimony is false and relevant evidence to this perjury count.

#### c. *New World*

The government also seeks to introduce evidence of Hawkins' indebtedness to a private charter operator, also to show that he was, at or about the time of the transactions noted above, without funds and thus motivated to commit fraud. Robert Ettinger testified on March 7, 2005 as to the leasing of a private plane to fly White, Kemp and Hawkins to the Super Bowl in February 2003 at a cost of $58,000, paid for by one of Hawkins' companies. The government seeks to introduce further evidence from Ettinger that shortly after the Super Bowl trip, Hawkins became indebted to Ettinger's company in the amount of approximately $200,000, further supporting the government's position that Hawkins was lacking substantial assets and thus had a motive to secure the assistance of White and Kemp to defraud Aslam Kahn, as discussed above.

#### 2. *Legal Discussion*

In support of his Motions 6, 7 and 9, Hawkins cites a number of cases, including

---

1. The argument on March 7, 2005 revealed a lingering issue as to whether litigation between Hawkins and Burger King is ongoing or was terminated as part of that agreement. The Court has suggested that counsel reach some agreement as to the status of the litiga- tion between Burger King and Hawkins. In the absence of such agreement, the Court may have a hearing outside the presence of the jury and examine the relevant documents as to the litigation to avoid confusing the jury on this point.

*United States v. Saniti,* 604 F.2d 603 (9th Cir.1979), *cert. denied* 444 U.S. 969, 100 S.Ct. 461, 62 L.Ed.2d 384 (1979) and *United States v. Reed,* 639 F.2d 896 (2nd Cir. 1981). However, both of these cases hold that the district courts did not err in allowing evidence as to the defendant's financial circumstances because it was relevant to show motive and intent. In *Saniti,* a bank robbery case, the district court admitted into evidence testimony that the defendant was addicted to heroin at the time of the bank robbery. The Ninth Circuit affirmed the decision of the district court, finding that the defendant's "$250–a–day heroin and morphine habit was properly admitted to show his motive for robbing the bank." 604 F.2d at 604. The court there noted that evidence tending to show that a defendant is living beyond his means is of probative value where the charged crime resulted in financial gain. *Id.* In *Reed,* a securities fraud case, the district court admitted evidence that the defendant purchased other securities—unrelated to those described in the indictment—with checks drawn on bank accounts having insufficient funds. The Second Circuit affirmed, holding that such "similar act evidence" was admissible, in part, to show knowledge and intent. 639 F.2d at 906.

Similarly, in another case cited by Hawkins, *United States v. Lacayo,* 758 F.2d 1559 (11th Cir.1985), the court affirmed a conviction and found that there was no error in allowing financial evidence, including the fact that the defendant was in dire financial straits. In this kidnapping case, the district court admitted evidence of a prior drug deal between the defendant and a co-conspirator involved in the kidnapping. In affirming the district court, the Eleventh Circuit held that the evidence was admissible "to show motive and willingness to become involved in criminal activity because of [the defendant's] desperate financial condition." 758 F.2d at 1564.

Hawkins acknowledges that there are many cases that allow evidence of motive and intent, and also evidence of financial condition, to prove motive and intent, but asserts those cases involve facts where there was objective evidence of motive, or the financial evidence was itself an integral part of the crime charged (such as in drug cases), whereas in this case there is first, no objective evidence of motive, and also, a lack of the necessary link between the evidence of financial condition—even as evidence of motive and intent—and the evidence of the alleged criminal conduct.

Although Hawkins' argument is creative and intriguing in seeking to draw such a theme from the existing case law (neither the parties nor the Court has located a precedential Third Circuit case on this issue), the case law does not support the distinction which Hawkins urges this Court to make.

■ The Court analyzes this issue under general rules of relevancy, F.R.E. 403, as well as under F.R.E. 404(b), which prohibits evidence of "other crimes, wrongs, or acts" to show propensity to commit the crime charged, but it may be "admissible for other purposes, such as proof of motive, opportunity, intent ..." The general rule is that a criminal defendant's financial condition, particularly that he is without funds, is not admissible, if only because allowing the prosecution to introduce such evidence in the normal case would almost certainly be prejudicial, in that an individual's lack of money would automatically put every poor person under suspicion and perhaps lead a jury to convict someone more for their poverty than for their criminal activity. *See United States ex rel. Mertz v. New Jersey,* 423 F.2d 537 (3rd Cir.1970). Proof of a defendant's stated intent to gain additional funds is frequently admitted in the context of drug transac-

tions where the opportunity for quick financial gain is part and parcel of the drug transaction itself. In fraud cases, where motive and intent have particular evidentiary value, the courts have generally not allowed evidence of a defendant's financial status alone, without more, to be introduced. However, in many fraud cases, such as *Reed, supra,* courts have admitted specific evidence that a defendant is facing financial pressure, as allowing the jury to make an inference of criminal motive or intent from what may appear on the surface to be a routine commercial transaction.

There are other cases which have reversed convictions for improper use of financial status evidence. *See United States v. Nill,* 518 F.2d 793 (5th Cir.1975), where the district court improperly allowed the defendant to be cross examined as to whether his "goal was to become a millionaire before [he was] 40," and similar questions; *see also United States v. Mitchell,* 172 F.3d 1104 (9th Cir.1999), where the court conditioned admission of financial status evidence on an abrupt change in circumstances, which is doubtfully the case here. Of course, an individual's net worth can be difficult to generalize, and the issue can be confusing to a jury. Some individuals may honestly believe they have large amounts of fixed assets, but have debt and/or completely illiquid assets as to actual cash on hand. Some individuals may also honestly, but mistakenly, overvalue their assets.

### 3. *Application of the Law to the Facts*

In this case, there is some evidence, including the extracts from the recorded conversations quoted in the government's briefs on this issue (particularly Ex. 159), to allow the jury to consider whether Hawkins had a fraudulent intent in his discus-sions and actions in the transactions at issue. This includes the Super Bowl trip, the Kahn evidence and the facts surrounding the two $5,000 checks. Indeed, a reasonable argument can be made that the government's evidence on these transactions presents "objective" evidence of Hawkins' motive and intent. Also, the facts surrounding one perjury count (No. 38) require the Court to allow the government an opportunity to introduce evidence to prove Hawkins' testimony was knowingly false.

■ The Court concludes that the government's evidence as to the Pizza Hut and Burger King transactions may be admitted, but in summary fashion, assuming the government has established that Mr. Kahn had some knowledge of, and relied on, Hawkins' representations about his relationship with Pizza Hut and/or Burger King, leading up to the Waldorf Astoria meeting. The Court finds that the introduction of this evidence is not collateral or prejudicial because it relates to Hawkins' own statements. The government contends that when Hawkins stated he was in business with them, it was not true, and the government asserts it can succinctly prove it was not true. Further, Hawkins asserted similar facts in front of the grand jury in February 2004, and the Court believes this evidence would be relevant in assessing Hawkins' intent when testifying before the grand jury.

Whether any financial details may be introduced will depend on whether they can be presented succinctly and without confusing the jury or prolonging the trial. The government may call a witness to establish that Hawkins did not have any franchisee relationship with Blockbuster.

Although the parties have briefed this issue by touching on Rule 404(b), the Court finds that Hawkins' franchise relations are not themselves "crimes or

wrongs" but they are "other acts" and may be admitted to prove motive and intent. Because these are not crimes or wrongs, there is no danger of the jury considering them to prove the character of Hawkins or any kind of propensity evidence.

Whether Hawkins' financial status at the time of his meeting in the Waldorf Astoria on May 8, 2003, and also at the time he testified before the grand jury in February 2004 is admissible, is a more difficult question.

The Court must also take into account Rule 403, which reads:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

■ The Court concludes from the case law cited above that evidence of an individual's financial condition is admissible when it bears directly, but not collaterally, on transactions that are relevant to the indictment. As a general matter, the Court concludes that because evidence as to motive and intent is generally admissible, subject to the balancing test in F.R.E. 403, Hawkins' own words and conduct will be admitted, with two exceptions.

■ The Court finds that Hawkins' statement about being a multi-millionaire is collateral to the actual charge of perjury contained in Count 38, and therefore the court will grant Hawkins' motion as to this point.[2] The Court will consider a request to redact this specific testimony. If it is introduced, the Court will, upon the request of Hawkins, give a limiting instruction, and will preclude the government from introducing extrinsic evidence during its case in chief as to Hawkins' financial status, or that he was not a multi-millionaire. The Court will also sustain the objection to the New World debt. The Court assumes Hawkins will not present his own evidence as to his financial status. If he is allowed to do so, the Court may then find that he has "opened the door" and allow the government appropriate rebuttal.

The Court concludes that without evidence of Hawkins' debt and net worth, the remainder of Hawkins' argument goes to the weight of the testimony. The Court concludes that in the absence of the government attempting to demonstrate specific "balance sheet net worth" of Hawkins, that, assuming the other evidence which the government intends to present as to the Pizza Hut and Burger King relationships can be presented succinctly, it is either directly relevant to some of the allegations or is circumstantial evidence that is admissible for the jury's consideration as to whether Hawkins had the motive or intent to join the conspiracy or commit wire fraud. The Court may hold a preliminary hearing before allowing this testimony.

The Court will sustain an objection to evidence the government may want to introduce as to "balance sheet net worth" because that would open a whole line of collateral evidence, both on defense and sur rebuttal, as the potentially complex and perhaps indeterminable issue as to exactly what was Hawkins' financial condition at a particular point in time, an issue that is collateral in this case.

An appropriate Order follows.

---

2.  Count 38 charges Hawkins with perjury as to the purpose of the $5,000 check, not as to his statement that he was a multi-millionaire. The Court is also concerned that emphasis on this latter point would not be "material" and is also prejudicial for this reason. *See generally U.S. v. McLaughlin*, 386 F.3d 547 (3d Cir.2004).

## ORDER

AND NOW, this 11th day of March, 2005, in connection with Defendant Hawkins' Motions in Limine 1–9, it is hereby ORDERED as follows:

1. Motions No. 1 (Doc. No. 453) and No. 5 (Doc. No. 452) are held under advisement pending further evidence.

2. Motion No. 2 (Doc. No. 455) is GRANTED as to the holding of a Rule 104 hearing.

3. Motions No. 3 (Doc. No. 454), No. 4 (Doc. No. 451) and No. 8 (Doc. No. 471) are DENIED.

4. Motions No. 6 (Doc. No. 466), No. 7 (Doc. No. 467) and No. 9 (Doc. No. 483) are GRANTED in part and DENIED in part, in accordance with the foregoing Memorandum.