**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Salvador LACAYO, Jr.,**
**Defendant-Appellant.**

No. 84–5005.

United States Court of Appeals,
Eleventh Circuit.

April 30, 1985.

Michael G. Smith, Ft. Lauderdale, Fla. (Court appointed), for defendant-appellant.

Stanley Marcus, U.S. Atty., Frederick Mann, Linda Collins-Hertz, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellee.

Before FAY and JOHNSON, Circuit Judges, and DYER, Senior Circuit Judge.

FAY, Circuit Judge:

Appellant challenges his conviction for conspiracy to kidnap, 18 U.S.C. § 1201(a), and aiding and abetting a kidnapping, 18 U.S.C. §§ 1201(c) and 2, on the following grounds: (1) denial of due process and a fair trial because of the district court's refusal to disclose to the jury that the government reserved the right to make a specific recommendation as to the sentences imposed on two co-defendants; (2) abuse of discretion in admitting certain extrinsic act evidence; (3) prosecutorial misconduct in making certain remarks in opening statement; and (4) admitting prejudicial evidence that the victim's family had been involved in prior kidnappings and showing appellant's involvement with the Colombian Mafia. We affirm.

## I. FACTUAL BACKGROUND

This case involves the kidnapping of Mrs. Quinonez, the wife of Roberto Quinonez, the former Ambassador of El Salvador, from her home in Miami, Florida on July 8, 1983. Mrs. Quinonez was abducted by Juan Caceres, Craig Blas, and three young men recruited by Blas in Washington, D.C. to help in the abduction. The plot was masterminded by appellant Lacayo.

Caceres and Lacayo had met in 1980, when the two men attempted to put together a business deal, which ultimately fell through. Subsequently, appellant Lacayo proposed another venture, that is, that Caceres travel with him to Europe to redeem, at a favorable rate, some "victory notes" issued during WW II. Caceres ultimately was swindled out of advance money he put up for the deal. As a result, he lost his home in Guatemala and moved to Alexandria, Virginia with his family.

Sometime in 1982, Lacayo proposed kidnapping Roberto Quinonez for ransom, and suggested to Caceres that Mr. Quinonez was responsible for the fact that he and Caceres had lost their money in the "victory notes" deal. Sometime in January or February of 1983, Caceres travelled from his home in Alexandria, Virginia, to Miami, Florida, to meet with appellant to discuss the plans for the kidnapping. Lacayo advised Caceres of certain personal habits and traits of Mr. Quinonez and they followed him about town, staking out his residence and office. It was then decided that Caceres would return home and enlist the abductors for the kidnapping.

Upon his return to Virginia, Caceres enrolled his friend, Craig Blas, to recruit the abductors. Blas found three individuals to assist in the kidnapping: Mack Carr, Robert Anthony Gerald and Clifford Bibbs.[1] It

---

1. This was the second group of abductors that had been recruited. In March of 1983, Blas brought two Cubans down from Virginia to Miami. Caceres, however, decided that the Cu-

was agreed that Blas, Carr, Gerald and Bibbs would abduct Mr. Quinonez' wife and hold her until the ransom was paid; Caceres would be in charge of communications, instructing the victim's relatives on what to do and relaying information and instructions to the abductors; and Lacayo, who supposedly knew the victim's family and was aware of their activities, would observe the transfer of the ransom money. Each would be paid handsomely for his role in the operation.

On July 3, 1983, Caceres, Blas, Carr, Gerald and Bibbs travelled from Washington, D.C. and arrived in the Miami area on July 4, 1983. From July 4, 1983 until July 8, 1983, the group staked out the Quinonez residence, following the victim and her husband about town, discussing the details of the plot. Caceres met with appellant on several occasions to discuss the procedure that would be followed. Lacayo suggested that Caceres stay at an apartment that he had access to and gave Caceres his key to the apartment and instructed him on how to use the telephone and what to tell Mr. Quinonez once his wife was abducted.

On Friday afternoon, July 8, 1983, while returning home from work, Mrs. Quinonez was abducted by Blas, Carr, Gerald and Bibbs. She was assaulted, tied, and placed on the floor of the car. Prior to tying her up, her abductors asked for her husband's telephone number, which she wrote down on an envelope. Mrs. Quinonez was then driven to Washington, D.C., where she was kept at the apartment of Jennifer Brown, Mack Carr's girlfriend. Blas gave Caceres the telephone numbers for both the home and office of Mr. Quinonez. Prior to making his first ransom calls to Mr. Quinonez, Caceres was given Salvadoran slang words by Lacayo to be utilized in Caceres' ransom call to Mr. Quinonez, to make Quinonez believe that the abductor of his wife was one of a group of Salvadoran guerrillas. Caceres later telephoned Mr. Quinonez at

his office and stated that his wife had been taken for a ransom of $1.5 million dollars.

Meanwhile, in Miami, appellant Lacayo and Caceres went to a shopping center on Saturday morning, July 9, 1983, and purchased a briefcase. The plan they developed was to obtain a briefcase just like the briefcase they would require Quinonez to use for the ransom money, and to fill it with newspapers. The two would be switched by Lacayo in a men's restroom at the Miami International Airport. The briefcase containing the newspapers would be sealed with a special seal, making it difficult to know when the switch had taken place.

A series of ransom calls were placed by Caceres during the week following the kidnapping. During this time, Mrs. Quinonez was still being held captive in the Washington, D.C. apartment. She was treated fairly well, until Blas became convinced that Caceres was bungling the operation, because the ransom money had yet to be paid. On Thursday, July 14, 1983, Blas called Mr. Quinonez himself and demanded payment of the ransom money. That same evening, Blas and his cohorts took the victim to a public pay phone, so that she could call her husband to assure him she was still alive. At that point, the FBI, who had the group under surveillance, rescued Mrs. Quinonez.

## II. THE LAW

### A. The *Giglio* Issue

Appellant contends that he was denied due process of law because the district court refused to disclose to the jury that the government had reserved the right to make a specific recommendation as to the sentences imposed on co-defendants Caceres and Blas, who testified at trial. Each pled guilty to one count of conspiracy to kidnap prior to trial. Prior to their testimony, counsel for appellant moved for disclosure of any "deals" made by the govern-

bans were too unstable to assist in the kidnapping and they returned to Virginia. Several days later, Lacayo began calling Caceres in Virginia to determine whether a new group of abductors had been recruited.

ment with the co-defendants in exchange for their cooperation. The prosecutor responded:

The government has reserved the right to advise the Court of any cooperation of [Blas] and to make a specific recommendation as to the sentence, but there have been no promises to [Blas] or no deals or accommodations other than the exchange of the government's intention to dismiss the other counts in the indictment after [Blas'] change of plea to conspiracy ... I believe I told Mr. Cullen, the defense attorney, that the government would take upon itself to apprise the court of any cooperation from [Blas] now a witness, at the time of his sentencing. That was never a condition to the change of plea. That was simply a representation that the government made.

R.Vol. 13 at 1602–03.

At oral argument, counsel for the government, who tried the case in the district court, assured us that no deal had been made and that the government uniformly reserves the right to make a recommendation as to sentencing.

■ Appellant's assertion of error rests on *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), in which the Supreme Court held that a convicted defendant is entitled to a new trial if he can establish that the government failed to correct materially false testimony relevant to the testimony of a key prosecution witness, including evidence of a prior "deal" between that witness and the government. To warrant a new trial, the agreement of leniency must have been reached prior to the witnesses' testimony. *United States v. Ramirez*, 608 F.2d 1261, 1266 (9th Cir.1979). We do not believe that appellant has shown us any direct, or, for that matter, any convincing indirect, evidence of promises of leniency in exchange for testimony. *See United States v. Baskes*, 649 F.2d 471, 476–77 (7th Cir.1980), *cert. denied*, 450 U.S. 1000, 101 S.Ct. 1706, 68 L.Ed.2d 201 (1981). In fact, we note that after the court imposed a sentence of seventeen years imprisonment as to Ca-

ceres and three years imprisonment as to Caceres' wife, the government opposed defendants' subsequent motions to reduce those sentences. The government's reservation of the right to make a recommendation at sentencing appears to us to be a fairly standard procedure. At Blas' sentencing hearing, the government recommended that Blas be sentenced under the Youth Corrections Act, noting Blas' cooperation, which was "motivated [not] simply to better himself, but to make some atonement for what he ... had done. R.Vol. 1 at 10 (2d Supp. Record). The government, however, did not recommend a specific number of years, as the government felt that Blas was slightly more culpable than some of his accomplices. We conclude that appellant has not presented evidence of a promise of leniency as to either of the two co-defendants who testified against appellant: there accordingly has been no denial of due process of law.

## B. Extrinsic Act Evidence

■ Appellant contends that the district court erred in admitting extrinsic act evidence showing that appellant and Caceres were involved in a prior drug deal and that appellant and Caceres were involved in a business venture, in which Caceres was defrauded of $60,000.00. We do not find any abuse of discretion in the admission of this evidence. Under the two-part *Beechum* test, we believe that the evidence was relevant and its probative value not outweighed by its undue prejudice. *United States v. Beechum*, 582 F.2d 898, 914 (5th Cir.1978) (*en banc*), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

We acknowledge that, at first blush, the relevancy of this extrinsic act evidence with regard to the actual kidnapping scheme appears attenuated. However, the circumstances of the kidnapping were bizarre, and evidence was needed to explain why the events occurred as they did. For example, the evidence that appellant and Caceres had been victims of a fraud in Europe in 1981 was relevant to the question of why Mrs. Quinonez was chosen to

be the kidnapping victim. Caceres testified that it was only because Lacayo led him to believe that Mr. Quinonez had been behind the 1981 fraud that Caceres agreed to the kidnapping. This evidence was relevant for two reasons: one, to explain the motive for selecting Mrs. Quinonez as the kidnap victim, and two, to show the reason for the continuation of the relationship between appellant and Caceres after the trip to Europe in 1981; that is, the belief of both men that they had been defrauded in the "victory notes" deal.

The district court also denied appellant's motion to exclude evidence of a proposed prior drug deal between appellant and Caceres. The government sought to introduce evidence that in 1981, Lacayo proposed to Caceres that he act as a drug courier to bring drugs back from Mexico, for $50,000 for each kilogram. In ruling on appellant's motion, the district court concluded that such evidence would show "that the two men had a relationship wherein they trusted each other enough to discuss serious violations of the law.... it also shows ... that the defendant [Lacayo] had a motive to become involved [in illegal activity] and a willingness to become involved in violation of criminal law because of his dire financial straits." (R.Vol. 9 at 983–84, 985). We agree with the district court that the extrinsic act evidence was relevant to show motive and willingness to become involved in criminal activity because of appellant's desperate financial condition. *See United States v. Parker,* 549 F.2d 1217, 1222 (9th Cir.) (evidence of drug dealings admissible to show motive to commit robbery), *cert. denied,* 430 U.S. 971, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977). We conclude that the admission of the extrinsic act evidence did not constitute an abuse of discretion.

### C. Prosecutorial Misconduct

Appellant's allegation of prosecutorial misconduct merits discussion. Appellant contends that the prosecutor injected his personal beliefs in his opening statement, which denied appellant a fair trial. Specifi-

cally, the prosecutor told the jury that what they were about to hear was a "true story" and that the defendant was guilty of the crimes charged. The pertinent portions of the prosecutor's opening statement are as follows:

> What you are about to hear is a true story.
>
> Now, many of us have gone to the movies or read in books, those words "What you are about to hear is a true story."
>
> Those words are normally reserved for a book or a movie. While this case may seem like a movie or like a book, it was real.
>
> The story you are about to hear is true. The people, the places and the times were real. It was here and it was now.

R.Vol. 4 at 38–39.

> The evidence will show and I submit to you that the conclusion that you will reach is that this man, this defendant, is guilty. He is guilty of the crimes of which he is charged. He is guilty of conspiracy with others to commit the crime of kidnapping....
>
> He is also guilty of the crime itself. even though he never touched the victim, he never put a hand on her, he is guilty....

R.Vol. 4 at 40–41.

These remarks were not objected to by trial counsel, and review is therefore limited to the "plain error" standard. Fed. R.Crim.P. 52(b). The Supreme Court has recently reiterated that "Rule [52(b)] authorizes the Courts of Appeals to correct only 'particularly egregious errors,' *United States v. Frady,* 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982), those errors that 'seriously affect the fairness, integrity or public reputation of judicial proceedings,' *United States v. Atkinson* [297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)]." *United States v. Young,* —— U.S. ——, 105 S.Ct. 1038, 1046–47, 84 L.Ed.2d 1 (1985). Therefore, the plain error rule must be used sparingly, and such an assertion must be evaluated in

the context of the entire record. *Id.* 105 S.Ct. at 1047.[2] Apart from the plain error rule, the two-part test for determining the existence of prosecutorial misconduct is whether the remarks were improper and whether they prejudicially affected the defendant's substantial rights. *United States v. Zielie,* 734 F.2d 1447, 1460 (11th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 957, 83 L.Ed.2d 964 and —— U.S. ——, 105 S.Ct. 1192, 84 L.Ed.2d 338 (1985).

This issue is governed by the recent case of *United States v. Young,* —— U.S. ——, 105 S.Ct. 1038, 84 L.Ed.2d 1, in which the Supreme Court addressed the question of what remarks by the prosecutor will constitute plain error. In *Young,* the prosecutor, who was responding to an attack by defense counsel, stated, *inter alia,* that:

> I think [defense counsel] said that not anyone sitting at this table thinks that Mr. Young intended to defraud Apco. Well, I was sitting there and I think he was.... If we are allowed to give our personal impressions *since it was asked of me....* I don't know what you call that, I call it fraud.

*Id.* 105 S.Ct. at 1041 (emphasis supplied by the Court).

The prosecutor then commented that the jurors would not be doing their jobs unless they convicted the defendant. *Id.* at 1041–42. The Supreme Court held that this was error; however, it went on to hold that the remarks, when viewed in the context of the entire record, did not constitute plain error.

■ We conclude that the remarks made in the instant case were not improper. *See United States v. Zielie,* 734 F.2d at 1460–61. Unlike the comments made in the *Young* case, which were repeated assertions of personal belief in the defendant's

guilt, we note that the remarks here were prefaced by the standard "The evidence will show and I submit to you" language. *Cf. United States v. Granville,* 716 F.2d 819, 822 (11th Cir.1983) ("When the prosecutor voices a personal opinion but indicates this belief is based on evidence in the record, the comment does not require a new trial."), *aff'd on rehearing,* 736 F.2d 1480 (1984). In light of the bizarre factual background to this case, the remark that "what you are about to hear is a true story" was permissible. All the prosecutor was asking the jury to do was separate fact from fiction.

However, we also note and wish to emphasize that the prosecutor's remarks create serious problems and should be avoided. They fall in that "gray zone", *see Young,* 105 S.Ct. at 1042, lying between improper and acceptable advocacy; such remarks run the risk of inducing "the jury to trust the Government's judgment rather than its own view of the evidence." *Id.* at 1048.[3] In this case, we conclude that they did not prejudicially affect any substantive rights of appellant. *See United States v. Cole,* 755 F.2d 748, 767–769 (11th Cir.1985).

■ Even assuming *arguendo* that the remarks made by the prosecutor were improper, they clearly did not amount to plain error. *See United States v. Young,* —— U.S. ——, 105 S.Ct. 1038, 84 L.Ed.2d 1; *see also United States v. Butera,* 677 F.2d 1376, 1382–83 (11th Cir.1982) (remark by prosecutor that defendant got caught and was guilty was harmless error), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983). As in *Young,* the remarks contained no suggestion that the prosecutor was relying on information outside the evidence presented at trial, 105

---

**2.** We have recently been reminded that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Young,* 105 S.Ct. at 1044.

**3.** We take this opportunity to remind counsel that "[i]t is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence of the guilt of the defendant." ABA Stds. for Crim. Justice 3–5.8(b) (2d ed. 1980). *See Young,* 105 S.Ct. at 1043; *see also* ABA Code of Professional Responsibility DR 7–106(C); ABA Model Rules of Professional Conduct, Rule 3.4(e) (1983).

S.Ct. at 1048, and the overwhelming evidence of appellant's participation in the kidnapping "eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberation." *Id.* at 1049. *See Hance v. Zant,* 696 F.2d 940, 951 (11th Cir.), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983). Therefore, the alleged prosecutorial misconduct did not amount to reversible error.

#### D. Prejudicial Evidence

■ Appellant also asserts as error certain trial rulings regarding the admissibility of evidence showing that the victim's family had been involved in prior kidnappings and that appellant had some association with the Colombian Mafia. Again, these rulings were not objected to by trial counsel and are therefore governed by the plain error standard. The admission of testimony at trial regarding the prior kidnappings of the victim's family was relevant to explain the code and questions used by Mr. Quinonez to ascertain whether his wife was still alive, why the kidnappers expected to be paid a ransom, and why the kidnappers used Salvadoran Spanish slang and revolutionary rhetoric when dealing with the victim's husband. Given the highly relevant nature of this evidence, its admission was not error.

■ Similarly, the evidence that appellant referred to his employers as members of the Colombian Mafia and that he told Caceres that the Miami apartment Caceres stayed in was used by his Mafia friends served several purposes. One, the statements explained why appellant told Caceres not to answer the phone unless it rang a certain number of times, and two, they explained why Caceres first thought that he was being followed in Miami by members of the Mafia, rather than by FBI agents. Admission of this testimony did not constitute plain error, so as to "seriously affect the fairness, integrity and public reputation of the judicial proceedings." *United States v. Russell,* 703 F.2d 1243, 1248 (11th Cir.1983).

Accordingly, the judgment of the district court is AFFIRMED.