**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Steven SAWYER, Harvey M. Bloch, Allen C. Leavitt, Defendants-Appellants.**

**No. 84–5677.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 24, 1986.

Nathan Z. Dershowitz, Dershowitz & Eiger, P.C., New York City, for Sawyer.

Leon Kellner, U.S. Atty., Miami, Fla., Barry D. Goldman and Lucy L. Thomson, U.S. Dept. of Justice, Fraud Section, Crim. Div., Washington, D.C., for U.S.

Sheryl J. Lowenthal, Coral Gables, Fla. (Court-appointed), for Leavitt.

Irving P. Seidman, New York City, and Fred A. Schwartz, Entin, Schwartz, Barbakoff & Schwartz, North Miami Beach, Fla., for Bloch.

Before FAY and KRAVITCH, Circuit Judges, and HENLEY,* Senior Circuit Judge.

## CORRECTED OPINION.

PER CURIAM:

This case arises out of a "boiler room"[1] operation at Stanford Management Corporation (SMC), a Hallandale, Florida based commodity pool operator and trading advisor. Appellants Steven J. Sawyer, a principal of SMC, and Alan C. Leavitt, an SMC

---

* Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. In *United States v. Brien,* 617 F.2d 299, 302 n. 5 (1st Cir.), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980) (quoting *S.E.C. v. R.J. Allen & Assocs.,* 386 F.Supp. 866, 874 (S.D. Fla.1974), the court offered the following description of a "boiler room":

'Boiler room' activity consists essentially of offering to customers securities of certain issuers in large volume by means of an intensive selling campaign through numerous salesmen by telephone or direct mail, without regard to the suitability to the needs of the customer, in such a manner as to induce a hasty decision to buy the security being offered without disclosure of the material facts about the issuer.

salesman, were convicted after a jury trial on eleven counts of mail and wire fraud, 18 U.S.C. §§ 1341 and 1343 (1982); commodity fraud, 7 U.S.C. §§ 6o(1) and 13(b) (1982); interstate transportation of a security taken by fraud, 18 U.S.C. § 2314 (1982); and one count of conspiracy under 18 U.S.C. § 371 (1982). Prior to trial, appellant Harvey M. Bloch, SMC's president, entered a conditional plea of guilty to one count of commodity fraud and one count of conspiracy. Appellants raise the following issues on appeal: (1) whether the evidence was sufficient to support the convictions of Sawyer and Leavitt; (2) whether the district court abused its discretion by denying Sawyer's and Leavitt's motions for severance; (3) whether the district court abused its discretion in certain evidentiary rulings; (4) whether the district court erred in refusing to grant judicial use immunity for a proposed witness of Sawyers'; (5) whether the government's opening statement constituted prosecutorial misconduct requiring reversal of Sawyer's conviction; (6) whether the district court erred in denying Bloch's motion to suppress evidence seized pursuant to the execution of a search warrant at SMC; and (7) whether Bloch's guilty plea was involuntary. Finding no error, we affirm.

## I. BACKGROUND

On March 8, 1983, a grand jury in the Southern District of Florida returned an eighteen count indictment charging appellants and four codefendants [2] with devising and promoting a scheme to defraud members of the public who were induced to invest in commodity pools operated by SMC. The indictment specifically charged that the defendants falsely represented that SMC's commodity pools operated profitably and involved relatively low risk, when in fact, the great majority of the pools lost money; and that they intentional-

ly concealed information regarding SMC's operating losses, large commissions and fees charged, and the actual value of investors' accounts. It was further charged that a false and misleading disclosure statement was distributed to SMC's investors. The evidence at the ensuing twenty-four day trial, which included the testimony of appellant Bloch, various SMC employees, SMC's lawyer and a parade of disgruntled SMC investors, provided the following background on SMC's troubled history and operations.

The SMC saga began in 1979 when Bloch, a former New York restauranteur, was invited to Florida to join a commodities business that his cousin, appellant Steven J. Sawyer was putting together. Early in 1980, Bloch became Sawyer's partner in a branch office of David H. Siegel & Company (DHS), a commodities pool operation. Bloch held the title of vice-president; David Siegel was the trader; William Zipkin and appellant Leavitt were in sales; and Sawyer was in charge of administration. Siegel and Michael King also owned SMC, which was not in use, thought it had a Futures Commission Merchant license.[3] This license, which DHS did not have, would allow SMC to solicit individual clients for individual commodities accounts, rather than just for pools. In June of 1980, Sawyer arranged for Bloch to purchase one hundred percent of SMC stock from Siegel and King. Bloch thus became SMC's sole record shareholder and its president. Bloch testified, however, that he and Sawyer were actually partners with Sawyer getting sixty percent of the profits and assets of SMC. There was no written document to this effect as Sawyer told Bloch he did not want to be a named owner of SMC because of personal problems, including the pendency of a million dollar lawsuit and other matters unrelated to the commodities business.

---

**2.** The four co-defendants were, like appellant Leavitt, SMC salespeople. Philip H. Gold was tried and convicted, but has not appealed; Arthur P. Allen and William L. Zipkin were also tried but acquitted on all counts; Mary Jane Seide pleaded guilty before trial and, thereafter, testified, as did appellant Bloch, for the govern-

ment. SMC itself was not named as a defendant.

**3.** SMC was registered with the Commodity Futures Trading Commission (CFTC) as a commodity pool operator and commodity trading advisor pursuant to the Commodity Exchange Act, 7 U.S.C. § 6n (1982).

After Bloch's acquisition of SMC, it replaced DHS but kept the same offices and employees. SMC began actively doing business in July 1980. Reflecting his controlling interest, Sawyer was integrally involved in SMC's operations from routine matters of office administration to matters of financial management. The latter included setting up SMC's sales programs; hiring salesmen; setting commissions; reviewing salesmen's performances and scripts used in sales solicitations; keeping track of money coming in from investors; and, thereafter, determining which dissatisfied investors should receive a return of their management fees. Sawyer also disbursed corporate funds and used them as his own.

SMC employed about one hundred twenty salesmen who solicited investors and sold interests via Watts lines in two kinds of commodity contracts, long-term futures pools[4] and managed account pools,[5] through the use of "boiler-room" sales tactics, *see supra* n. 1. Salesmen attended daily motivational sales meetings held by Bloch. They were eligible to win prizes for sales performance such as silver dollars, Krugerrands, or leased Cadillacs. During the course of one of Bloch's meetings, which was taped and played at trial, Bloch was heard to say that customers would be led to the slaughterhouse, and that salesmen should avoid direct questions from customers and keep their answers in the "gray" area.

In December of 1980, Sawyer and Bloch learned that SMC had incurred huge losses as a result of David Siegel's unsuccessful trades. Siegel was fired and Michael King was hired as the trader. King would subsequently prove as unsuccessful a trader as Siegel. Initially, Bloch and Sawyer thought the SMC pools had suffered losses of $200,000; by February 1981, they discovered that the pools had lost over $954,-000.00 in 1980. Sawyer and Bloch never informed their salesmen, their investors[6] or the Commodities Futures Trading Commission (CFTC) of the amount or nature of these losses.

In January 1981, Bloch directed that SMC's pools be consolidated into a smaller number of large pools. Investor's funds were transferred into these pools without their authorization or knowledge, and frequently, contrary to their instructions.[7] In spite of SMC's losses, in February of 1981, Sawyer gave Bloch a check payable to Bloch in the amount of $50,000.00, which they cashed and split sixty/forty— $30,000.00 for Sawyer, $20,000.00 for Bloch. In addition, numerous SMC checks

---

4. A long-term futures pool traded in a single commodity. SMC which made the trading decisions, charged each participant a management fee which averaged thirty-five to forty percent of the total investment.

5. In a managed account pool SMC traded futures contracts for a variety of commodities and charged each pool participant an initial management fee of ten percent of his investment. The pool was charged a commission of $95 for each transaction by the pool. Of this amount, SMC paid the executing salesman between $18–$25 and retained the balance for itself. Each pool participant paid a pro rata share of these commissions according to his proportional interest in the pool. Thus, an investor could be charged repeated commissions although his initial investment had not changed.

6. Investors only learned of these losses when they received monthly statements. SMC put in a new computer system and monthly statements were not available on it until February 1981, when investors received statements of their positions as of December 30, 1980; statements from January 1981 were received in March 1981.

7. The history of one commodity pool, "Managed 81" (8102), illustrates this activity. The first massive transfer of customer funds into 8102 occurred in January 1981 and involved the accounts of 139 investors totalling $33,956.60. On January 29, 1981, a much larger transfer of investor funds into 8102 totalling $396,993.81 occurred, again without their knowledge or permission. On February 5, 1981, when trading began, 8102 had an equity balance of $581,-008.83. SMC collected management fees of $53,716.00 from these transfers. Although SMC salesmen told inquiring investors that 8102 was operating profitably, this pool never operated at a profit during any month of its existence. While 8102 showed some trading gains, the enormous commissions absorbed the minuscule profits and all of the equity. In February, 8102 lost over $250,000; in March, it lost $268,000. By June 30, 1981, the remaining capital in 8102 was $.03.

were written to Score Realty, a company from whose account Sawyer paid his personal bills. There were checks to Sawyer's wife, his mother-in-law, his children's live-in governess, his maid and a female friend, none of whom performed any services for SMC.

Numerous investor complaints began coming into SMC. Investors complained that they were in the wrong pools, not in pools at all when they thought they were in, or that they did not know the net asset value (NAV) of their account and could not get that information. In particular, a number of complaints came in with respect to salesman Philip Gold. Gold consistently told his customers that their accounts had made money when, in fact, they lost money, and frequently were not even in the market. Gold also told his customers that they had purchased managed accounts with a ten percent management fee, and not futures pools which were charged a commission of between thirty-five and forty percent. He also concealed the poor performance of the SMC pools. At one point, around August or September of 1981, Bloch tried to fire Gold for lying to customer Richard Lassig. Shortly thereafter, however, Sawyer intervened, telling Bloch that Gold knew what he was doing and that Gold was staying and would report to Sawyer. In the middle of the sales room, Sawyer remarked that Bloch did not know how to handle Gold, and that Gold should go directly to Sawyer with any problems. In February 1982, Bloch tried once again to fire Gold for lying to customer Joseph Olivio, who had made a tape recording of Gold's misrepresentations. Sawyer said he would handle the problem and reinstated Gold, advising him to come to him if there were any more problems. Gold remained at SMC under Sawyer's supervision and sold pool interests to sixty-one investors after Sawyer defeated Bloch's attempts to fire him.

Four salesmen, including appellant Leavitt were assigned by Sawyer and Bloch to handle investor complaints. One SMC salesman testified that it was his understanding that these complaint "specialists" were supposed to mislead investors. At times, Sawyer and Bloch also handled complaints. When Sawyer did take calls from investors, he frequently used the aliases Sloan and Stern, Bloch would use the aliases Boatwright and Lehrer. In addition, each also sold to investors, with Sawyer responsible for handling the accounts of SMC's largest investors, Carl and Mary Lou Schulte and her brother Michael Kneifl. Sawyer personally solicited several hundred thousand dollars from both the Schultes and Kneifl but at no time did he tell them of the huge losses SMC's pools had suffered nor the money they were losing on their accounts. Sawyer's secretary testified that Sawyer said he could not believe the Schultes were dumb enough to keep putting their money in SMC.

In March 1981, attorney John Field was retained to deal with matters between SMC and the CFTC. From his observations of SMC salesmen, Field believed they did not understand how commodity pools operated. He, therefore, suggested to Bloch that SMC establish a compliance taping program, which is used by many commodities firms to ensure that customers understand the terms of investment contracts, including management fees and the risks involved in investing in commodities. Field prepared an outline for the compliance call and SMC began compliance taping in July 1981. Racquel Gil usually conducted the taping. She would call the investor and confirm the required information using a script. At one point, Sawyer decided that there was too much investor participation on the tapes, and he changed the script. Gil testified that she lied to investors about the number of brokers and traders at SMC and the management fees. She told people they were in the market before they really were, and she told them that their accounts had higher NAV's than they had. If asked a hard question, she turned off the tape.

Field was also asked to help revise SMC's existing disclosure statement.[8]

<hr>

8. CFTC regulations require that disclosure documents provide information to a prospective participant before he sends in his money. 17 C.F.R. § 4.21 (1985). Barbara Stern, special

Field suggested that the statement be amended to include a "track record" [9] and to disclose Sawyer as a "principal" [10] of SMC. A revised disclosure statement was subsequently prepared which correctly disclosed that Sawyer was a principal, and that SMC had operated pools over the past year, and which detailed SMC's trading results. It also revealed that SMC had reparations proceedings filed against it and that Sawyer had been the subject of a consent decree for a CFTC violation and paid a fine. [11] Bloch and Sawyer, who reviewed the statement, expressed concern over disclosing SMC's heavy trading losses. Sawyer made extensive changes and revisions. Following Sawyer's revisions and after consultation with Field, SMC filed a revised statement with the CFTC in February 1982. At Sawyer's direction, however, any reference to him or to reparations filed against SMC were deleted. This disclosure statement was never sent to prospective investors.

## II. SUFFICIENCY OF THE EVIDENCE

Appellants Sawyer and Leavitt contend that the evidence was insufficient to support their convictions. Our review of the government's evidence is limited to a determination as to whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc) (footnote omitted),[12] *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). It is not required that the evidence "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *Id.* All evidence must be viewed in the light most favorable to the government, and all reasonable inferences must be drawn in favor of supporting the jury's verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

 To warrant conviction under the mail and wire fraud statutes, the government must prove that the defendant partici-

---

counsel to the CFTC testified that the disclosure statement is designed to protect unsophisticated investors and, therefore, must contain information the CFTC believes material to an investment decision. SMC required each investor to fill out a "Disclosure Statement and Account Agreement Form" which, in small print, purportedly made all disclosures required by the CFTC. SMC used the same Disclosure Statement from September 1980 through May 1982.

9. A "track record" is the history of performance of a commodity pool operator's (CPO) pools. Pursuant to 17 C.F.R. § 4.21(a)(4), a CPO's current "actual performance record" must be disclosed to prospective investors if the CPO was operating pools within the past three years. As regards SMC's track record, by February 1981 Sawyer and Bloch had direct information from computer runs and audited financial statements about the huge losses in SMC's pools occasioned by Siegel's unsuccessful trades. *See supra* p. 1500. Sawyer and Bloch, however, were at a sales meeting in late April 1981 where SMC saleswoman Mary Jane Seide testified she questioned the Disclosure Statement's false representation that SMC had no track record. In response the SMC sales manager instructed the salespeople to lie and tell investors "that prior to January of 1981, the pools were non-existent ... [t]hat, in fact, the pools had not operated prior to January, '81." Sawyer and Bloch did not

comment and at no time did SMC send a revised statement to prospective investors to inform them of the huge losses.

10. The CFTC regulation defining "principal" changed in July 1981. Originally the term included persons who performed functions of officers or directors or who controlled directly or indirectly, more than ten percent of the company's equity interest. The regulation changed to include as a principal a person "having the power, directly or indirectly, through agreement or otherwise, to exercise a controlling influence over the activities of the entity." 17 C.F.R. § 4.10(e)(1). Sawyer would fit either definition.

11. Reparations are administrative proceedings investors file with the CFTC against a pool operator if they believe they have been defrauded in their investment in the pool. 17 C.F.R. § 4.21(a)(13)(i) requires that a disclosure document set out any "material administrative civil, or criminal action [against the pool's operator and the principals thereof] within the five years preceding the date of the Document."

12. In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982) we adopted as precedent decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981.

pated in a scheme to defraud involving the use of the mails or interstate communications in furtherance of the scheme. *See, e.g., United States v. Hewes,* 729 F.2d 1302, 1320 (11th Cir.1984) (mail fraud), *cert. denied, Caldwell v. U.S.,* 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985); *United States v. Cowart,* 595 F.2d 1023, 1031 n. 10 (5th Cir.1979) (wire fraud).[13] These are also the essential elements under the transportation of a security obtained by fraud and fraud by a commodity pool operator statutes. Fraudulent conduct that will establish a "scheme to defraud" includes knowingly making false representations, *United States v. Scott,* 701 F.2d 1340, 1344 (11th Cir.), *cert. denied,* 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 158 (1983), or concealing material facts, *United States v. O'Malley,* 707 F.2d 1240, 1247 (11th Cir.1983). It also includes statements made with reckless indifference to their truth or falsity. *United States v. Frick,* 588 F.2d 531, 536 (5th Cir.), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2013, 60 L.Ed.2d 385 (1979). Taking the evidence as a whole, we find it was more than sufficient for the jury to find that Sawyer and Leavitt participated in a scheme to defraud investors in SMC through misrepresentation and concealment of material facts.

1. Steven Sawyer

██ Sawyer argues that the government held him responsible for SMC's fraudulent activity solely by attempting to prove he was a principal at SMC. He asserts that the government never proved that Sawyer willfully participated in a scheme with knowledge of its fraudulent nature. Sawyer says he was a mere consultant at SMC, not a principal, and argues that even if he was a principal, he is not liable for the acts of SMC salesmen. These arguments, however, are meritless. Sawyer is liable because of his fraudulent conduct, not his position as a principal. The evidence shows he set up, supervised and benefitted from the fraudulent sales program from its inception, ratified and encouraged Philip Gold's fraud, defrauded the Schultes and Kneifl, and was instrumental in the dissem-

ination of SMC's deceptive disclosure statement. Sawyer helped establish and control SMC, receiving more money, directly for his benefit, than any other individual.

The evidence is clear that instead of instructing the sales force to tell the truth when he learned that SMC's pre–1981 pools lost over $900,000, Sawyer remained silent. Despite knowing these facts, the evidence shows Sawyer drafted a letter to be sent to investors that attributed the failure to inform them of their accounts to SMC's new computer program. The correspondence never informed investors about the poor performance of SMC's pools. Sawyer also personally defrauded the Schultes and Kneifl by directly soliciting their investments but never telling them about SMC's losses or the deteriorating value of their accounts.

Although Sawyer asserts he is not responsible for the fraudulent practices of the salesmen, he ignores the Philip Gold episodes, when on two separate occasions, Sawyer rehired Gold after Bloch had fired him for lying to investors, Lassig and Olivio. Sawyer severely criticized Bloch, not Gold, for these incidents. Under Sawyer's supervision, Gold continued to lie to more customers. Sawyer knew of Gold's misconduct and explicitly assumed responsibility for any problem involving Gold.

The evidence at trial further established that Sawyer, using the aliases Sloan and Stern, responded to inquiries of other customers. Although Sawyer argues there are no "badges of fraud" on his conduct, courts have recognized that the use of aliases when dealing with the public is a "badge of fraud." *See e.g., United States v. Pearlstein,* 576 F.2d 531, 535 (3d Cir. 1978) (use of aliases as circumstantial evidence of conscious deception). Finally, the evidence at trial firmly establishes Sawyer's central role in drafting the disclosure statement. He personally reviewed the drafts as soon as they came out of the typewriter and deleted material disclosures that SMC's attorney directed him to put in

---

**13.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc) we adopted as

precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

the document, including his role as a principal at SMC. Through the false disclosure statements, Sawyer concealed from investors that the pools suffered severe losses, that Sawyer was subject to a CFTC consent decree and that there were numerous claims filed against SMC. This concealment created a fraudulent appearance that SMC was a profitable, successful, well-run company. Concealment of such material information from investors constitutes fraud. *United States v. O'Malley,* 707 F.2d at 1247.

### 2. Alan Leavitt

■ The evidence shows Leavitt personally defrauded at least three investors, Lola Dugger, Reverend Clayton and Richard Lassig, by misrepresenting profits and concealing actual losses of SMC's pools. Leavitt argues that since he did not make the initial fraudulent representations to Dugger and Clayton, he cannot be held responsible. However, Leavitt defrauded Dugger and Clayton in two ways: (1) he misled them to induce them not to withdraw their funds in order to allow SMC's brokerage commissions to dissipate their accounts for several additional months; and (2) he fraudulently attempted to solicit additional funds from each investor.

From the net asset value (NAV) print outs on Raquel Gil's desk that Leavitt examined on a daily basis, Leavitt was aware of the losses of SMC's pools. Yet Leavitt told Dugger that she was up $1633 when, in fact, she had lost over $5000. Leavitt also falsely told Dugger she owned individual futures contracts. He aggressively sought more money from Dugger, recommending that she borrow another $20,000 in order to make "real money." He never told her that her account, and SMC's pools, were losing money. Leavitt lied to Clayton to induce him to keep his money in SMC, saying SMC's managed accounts did 77 percent last year, when, in fact, they lost money. Leavitt's statements to Clayton, that SMC's managed accounts had made money in the past and that the reason for the large brokerage commissions was the small number of participants in the pool, were similarly false and fraudulent.

Finally, Leavitt defrauded investor Richard Lassig by telling him that his account was up to $1100, $1937 and $1600 on three separate days, when, in fact, Lassig had no account and was not in the market until October 9, 1981. Leavitt blames Bloch and Raquel Gil for placing Lassig in a long term futures pool rather than the managed account pool Leavitt promised him. The evidence is otherwise, however, since Leavitt wrote the Lassig order ticket placing him in the long term futures Metals pool on October 2, 1981. In so doing, Leavitt and Gold split a higher commission from Lassig than they would have on the managed account pool, the investment originally offered.

Leavitt asserts he should not be held liable for mere "puffing" or over enthusiasm. However, Leavitt was held liable not for mere predictions, but rather for the lies he told investors about facts such as the value of their investments, the profits already made, and the nature of their accounts and fees. Such deliberate misrepresentations are not "puffing" but fraud. *Manufacturing Research Corp. v. Greenlee Tool Co.,* 693 F.2d 1037, 1040–41 (11th Cir.1982). The district court granted Leavitt's request for a "puffing" instruction. At most, therefore, Leavitt's claim of simple "puffing" was an alternate hypothesis of the evidence which the jury had the right to consider and reject. *See Bell,* 678 F.2d at 549.

## III. SEVERANCE

Appellants Sawyer and Leavitt contend that the district court abused its discretion in refusing to grant their motions for severance under Fed.R.Crim.P. 14. Both argue that the mutually antagonistic defenses presented by SMC's management and salesmen created prejudice resulting in an unfair trial. Leavitt also claims that he suffered additional prejudice due to his inability to call codefendants at trial to give exculpatory testimony, and by the spillover effect of damaging testimony concerning codefendant Philip Gold. We disagree.

■ We note at the outset the general rule that coconspirators should be tried jointly. *United States v. Esle,* 743 F.2d 1465, 1476 (11th Cir.1984). Under Fed.R. Crim.P. 14, the decision to deny a severance lies within the sound discretion of the trial judge, *United States v. Berkowitz,* 662 F.2d 1127, 1132 (5th Cir. Unit B 1981), and absent a clear showing of abuse it will not be overturned on appeal, *United States v. Pepe,* 747 F.2d 632, 649 (11th Cir.1984). Rule 14 requires a trial judge in reaching his decision, to balance the prejudice inherent in a joint trial against the interests of judicial economy and efficiency. *Id.* Therefore, to establish an abuse of discretion requiring severance, appellants must demonstrate that they "suffered compelling prejudice against which the trial court was unable to afford protection." *United States v. Riola,* 694 F.2d 670, 672 (11th Cir.) (quoting *United States v. Berkowitz,* 662 F.2d at 1132), *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1532, 78 L.Ed.2d 117 (1983).

■ To meet the test of compelling prejudice based upon antagonistic defenses, the defenses must be "mutually exclusive ... or irreconcilable." *United States v. Riola,* 694 F.2d at 672 (quoting *United States v. Berkowitz,* 662 F.2d at 1133). The defenses reach that level of antagonism "if the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant." *United States v. Berkowitz,* 662 F.2d at 1134. "Ultimately the test is whether the defendant received a fair trial." *Id.*

■ Appellants argue that the essence of each defense was to attempt to shift the blame for fraudulent activity either to the salesmen or to management, and to minimize the involvement of the individual concerned. However, while these defenses may be antagonistic, they do not satisfy the *Berkowitz* test of being irreconcilable or mutually exclusive. The record shows that appellants attempted to demonstrate their own limited involvement in the affairs of SMC by pointing to others in the firm with more specific knowledge or control, particularly targeting the government's witness Harvey Bloch. These defenses, however, would not have required the jury to find either appellant guilty of the fraudulent activity. The jury could consistently have accepted both Sawyer's defense that he had no responsibility for sales and trading and Leavitt's defense that as a mere salesman he only followed the instructions of SMC's management. The jury, instead, could have rejected the government's case and found Harvey Bloch fully responsible. "In short, '[t]he jury could have believed both [sets of] defendants' theories of defense.'" *United States v. Magdaniel-Mora,* 746 F.2d 715, 720 (11th Cir.1984) (quoting *United States v. Stephenson,* 708 F.2d 580, 582 (11th Cir.1983)); *cf. United States v. Crawford,* 581 F.2d 489 (5th Cir. 1978); *United States v. Johnson,* 478 F.2d 1129 (5th Cir.1973). Appellants have, therefore, failed to establish the 'compelling prejudice' necessary to warrant severance.

■ We also reject appellant Leavitt's additional claims of prejudice resulting from his inability to call codefendants on his behalf and prejudicial spillover. As regards the former claim, Leavitt asserts that had he been tried separately, he would have introduced testimony from his codefendants that he had followed the internal company policies at SMC and never misled any investors. However, as our predecessor court noted in *Tillman v. United States,* 406 F.2d 930, 936 (5th Cir.) (quoting *Smith v. United States,* 385 F.2d 34, 38 (5th Cir.1967)), *vacated in part,* 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969), "[a]n intention of the movant to have his codefendant testify has never been considered grounds for severance." In order to warrant severance based on a codefendant's potential testimony, a defendant must "demonstrate (1) a bona fide need for the testimony, (2) the substance of the testimony, (3) its exculpatory nature and effect and (4) that the co-defendant will in fact testify if the cases are severed...." *United States v. Pepe,* 747 F.2d at 651 n. 20 (quoting *United States v. DeSimone,* 660 F.2d 532, 539 (5th Cir. Unit B 1981), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1732, 72

L.Ed.2d 149 (1982)). Leavitt has failed to meet these requirements. In his proffer, offered for the first time on appeal, he indicates neither whom he would call on his behalf nor the likelihood that such testimony would be forthcoming. Moreover, he presents no "specific exonerative facts," *United States v. Pepe*, 747 F.2d at 651, to which any codefendant would testify, beyond the mere assertion that codefendants would be able to testify that Leavitt had no fraudulent intent.

■ Leavitt's second claim of prejudice based on the spillover effect of testimony concerning codefendant Gold is similarly unavailing. Leavitt specifically objects to statements which SMC saleswoman Mary Jane Seide testified were made by codefendant Gold. Twice, Seide testified that Gold had remarked to her and others that they were working for a "scam." On both occasions, the trial court granted Leavitt's motions to strike the testimony, and gave the jury instructions to disregard it. The trial also polled the jury individually to be sure each member could disregard that statement. Seide also testified that Gold referred to himself as "Dr. Gold." When asked why he did so, she testified Gold had told her, that "his specialty was performing cashierrectomies, which is the removal of money from one person's pocket to another." The court, however, struck the phrase "which is the removal of money from one person's pocket to another," allowing only the balance of the statement to come in.

In determining whether Leavitt was unfairly prejudiced by the testimony in question, the applicable test is whether, "under all the circumstances of the particular case ... the jurors [were able] to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct." *United States v. Cole*, 755 F.2d 748, 762 (11th Cir.1985) (quoting *Tillman*, 406 F.2d at 935). Based on the record before us we are satisfied that Leavitt has failed to demonstrate the requisite compelling prejudice. Certainly by striking the "scam" references, excluding parts of the "Dr. Gold" testimony and

cautioning the jury not to consider these statements in its deliberations, the court was able to "afford protection" against any unfair prejudice to Gold's codefendants. *See United States v. Berkowitz*, 662 F.2d at 1132. Moreover, the fact that after five days of deliberations, the jury convicted three of the defendants while acquitting two others satisfies us that the jurors were able to follow the court's admonitory instructions and evaluate the evidence separately and independently against each defendant. *See United States v. Cole*, 755 F.2d at 762; *Tillman*, 406 F.2d at 936. Accordingly, we find no abuse of discretion in the district court's denial of appellant's motions for severance.

## IV. EVIDENTIARY RULINGS

Leavitt claims he was denied a fair trial by: (1) the failure of the district court to grant a mistrial when Mary Jane Seide testified about the statements made by Gold; and (2) the admission into evidence of appellant's handwritten notes concerning his conversations with SMC clients. We reject both claims.

### 1. The Seide Testimony

■ Seide's testimony about "Dr. Gold" and his characterization of SMC as a "scam" did not require the district court to declare a mistrial. As previously discussed, to prevent any unfair prejudice to the other defendants, the court struck the "scam" references, excluded parts of the "Dr. Gold" testimony, and cautioned the jury not to consider these statements in its deliberations. In *United States v. Tenorio-Angel*, 756 F.2d 1505 (11th Cir.1985) we restated the rule in this circuit regarding evidence withdrawn from the jury:

An instruction to disregard evidence withdrawn from the jury is sufficient grounds for an appellate court to uphold a trial court's denial of a motion for mistrial unless the evidence is so highly prejudicial as to be incurable by the trial court's admonition. Such a level of prejudicial effect exists where there is a 'significant possibility ... that ... the

stricken statement had a substantial impact upon the verdict of the jury.'

*Id.* at 1512 (quoting *United States v. Slocum,* 708 F.2d 587, 598 (11th Cir.1983)) (citations omitted).

Although Leavitt argues that the introduction of Seide's testimony was a "deliberate attempt to prejudice [him] in the eyes of the jury," we find that any potential prejudice concerning Gold's statements would have affected all of the defendants. The fact, therefore, that the jury acquitted two defendants, while convicting the others leads us to conclude the jury did not allow the statements in question to influence its verdicts improperly. Accordingly, we find the district court did not err in refusing to grant a mistrial.

### 2. Leavitt's Handwritten Notes

Leavitt prepared and maintained handwritten notes documenting his conversations with SMC investors. The notes concerning two of those investors—Richard Lassig and Lola Dugger—were admitted into evidence, under Fed.R.Evid. 801(d)(2)(A) as an admission against a party opponent. Leavitt argues that two sentences in these notes, where he had written that Dugger was a "pain in the ass" and that he had her "eating out of [his] hand," were highly prejudicial and distracted the jury from the real issues and, therefore, should have been excluded under Fed.R. Evid. 403.

Because Rule 403 permits a trial court to exclude probative evidence, it is an extraordinary remedy which "should be applied sparingly." *United States v. Cole,* 755 F.2d 748, 766 (11th Cir.1985). The standard in this Circuit for exclusion of evidence under Rule 403 is clear:

> Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.

*United States v. Thevis,* 665 F.2d 616, 633–634 (5th Cir. Unit B) (quoting *United States v. McRae,* 593 F.2d 700 (5th Cir.), *cert. denied,* 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979)), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982). "In making this decision, the trial court has broad discretion which is reviewable only for abuse." *Id.*

Based on this standard, we are unpersuaded that the district court abused its discretion in admitting the notes. Contrary to appellant's assertion, both challenged statements are probative of his motive, intent and knowledge concerning the fraudulent conduct with which he was charged. *See United States v. McDonald,* 576 F.2d 1350, 1356 (9th Cir.), *cert. denied,* 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978) (defendant's statement to the effect that persons investing in high risk ventures "deserved to be screwed" admissible to show motive, intent and knowledge). We do not find that any prejudice resulting to Leavitt "substantially" outweighed this probative value.

### V. JUDICIAL USE IMMUNITY

Sawyer sought to call as his sole witness David Siegel, the trader who was responsible for SMC's losses in 1980 of approximately $900,000.00. Siegel, however, asserted his fifth amendment right against self-incrimination and refused to testify. The district court denied Sawyer's subsequent motion to provide judicial immunity for Siegel or to compel the government to do so. Sawyer's argument that this was error is meritless.

In *United States v. Thevis,* 665 F.2d 616, 639 (5th Cir. Unit B), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982), our predecessor court, after considering various policy arguments, concluded that district courts have no authority to grant immunity to a defense witness simply because that witness may possess exculpatory information. We are bound by

the decision in *Thevis, United States v. Gottesman*, 724 F.2d 1517, 1524 (11th Cir. 1984), and accordingly find no error in the court's refusal to grant Siegel use immunity. Moreover, although we recognized in *Gottesman* that a compelling argument could be made for judicially compelled use immunity in cases of governmental abuse of the immunity process, we declined to address that argument because we found no evidence of such misconduct. *Id.* at n. 9. We likewise find no evidence of governmental abuse in the handling of the immunity process in the instant case.

## VI. PROSECUTORIAL MISCONDUCT

Sawyer also asserts that in its opening statement the government engaged in prosecutorial misconduct requiring reversal. Sawyer challenges the remark made at the conclusion of the prosecutor's statement, when he informed the jury that: "You will hear evidence that Steven Sawyer told a representative of the CFTC in 1982, that Steven Sawyer was guilty." No confession was ever introduced nor did the government offer any evidence at trial that Sawyer made this statement to anyone in 1982 or at any other time.[14] Sawyer did not object or move to strike this statement and he did not request a mistrial on this basis.

We note at the outset that because Sawyer never moved for a mistrial or requested cautionary instructions at trial, he is entitled to a reversal of his conviction only if the prosecutorial conduct in question constitutes plain error under Fed.R.Crim.P. 52(b). See *United States v. Lacayo*, 758 F.2d 1559, 1564 (11th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). The Supreme Court has recently emphasized, in a case involving prosecutorial misconduct, that the "plain error" rule should be used sparingly and invoked only when a review of the entire record convinces the court that "a miscarriage of justice would otherwise result." *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985) (quoting *United States v.*

*Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982)).

We fully agree with appellant that the prosecutor's remark that Sawyer had confessed to the crimes charged and that there would be testimony to this effect, when none was in fact introduced, was highly improper. Our predecessor court has consistently condemned the practice whereby a prosecutor refers in his opening to a confession which may not be introduced. See *United States v. Stone*, 472 F.2d 909, 914 (5th Cir.1973) (such conduct on part of prosecutor was a "breach of propriety"), *cert. denied*, 449 U.S. 1020, 101 S.Ct. 586, 66 L.Ed.2d 482 (1980); *United States v. Killian*, 524 F.2d 1268, 1275 (5th Cir.1975) (prosecutor's remark referred to as "improper conduct"), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976). Nevertheless, within the context of the record before us, the prosecutor's remark did not amount to plain error requiring reversal. As *Young* makes clear, improper prosecutorial remarks standing alone would not justify the reversal of a conviction unless they undermined "the fairness of the trial and contributed to a miscarriage of justice." 105 S.Ct. at 1047 n. 14. We find that the remarks did not do so for two reasons. First, immediately before the opening statement, and at least six times during trial, the court instructed the jury that statements made by government or defense counsel were not evidence in the case. We believe these repeated cautionary instructions cured any prejudice resulting from the remark. See *United States v. Cole*, 755 F.2d 748, 769 (11th Cir.1985); *United States v. Nickerson*, 669 F.2d 1016, 1020 (5th Cir. Unit B 1982). Second, and more importantly, is the overwhelming independent evidence of Sawyer's guilt. This evidence "eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations." *Young*, 105 S.Ct. at 1049.

---

**14.** During oral argument before this court, the prosecutor claimed that he did have evidence that Sawyer had confessed to a CFTC representative but that he ran out of time at trial and, therefore, decided not to present that evidence. To say the least, we find this an unsatisfactory explanation.

## VII. MOTION TO SUPPRESS

Appellant Bloch entered a conditional plea of guilty to two counts of the indictment, reserving the right to appeal an adverse decision on his motion to suppress evidence. Bloch contends that the court erred by denying his motion to suppress evidence seized pursuant to the execution of a search warrant at SMC. First, Bloch argues that the warrant itself lacked particularity. Second, Bloch challenges the execution of the search, and asserts that the agents involved engaged in a "general exploratory rummaging" in violation of the Fourth Amendment. We disagree.

### 1. Particularity of the Search Warrant

As we observed in *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983), the particularity requirement of the Fourth Amendment must be applied with a practical margin of flexibility, taking into account the nature of the items to be seized and the complexity of the case under investigation. The Supreme Court has recognized that a complex criminal investigation may require piecing together "[l]ike a jigsaw puzzle" a number of items of evidence that may not appear incriminating when taken alone. *Andresen v. Maryland*, 427 U.S. 463, 481, n. 10, 96 S.Ct. 2737, 2749, n. 10, 49 L.Ed.2d 627 (1976). Moreover, in cases involving a pervasive scheme to defraud, all the business records of the enterprise may properly be seized. *See e.g., United States v. Accardo*, 749 F.2d 1477, 1479, n. 3, (11th Cir.), *cert. denied*, — U.S. ——, 106 S.Ct. 314, 88 L.Ed.2d 295 (1985); *United States v. Brien*, 617 F.2d 299, 308–09 (1st Cir.) (approving warrant authorizing seizure of materials that made up "most of the business records" of investment firm), *cert. denied*, 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980).

Applying these standards, we find no merit to Bloch's contention that the search warrant [15] should have been narrowed to include only the twenty-five customer transactions specifically described in the accompanying affidavits. The affidavits supporting the search warrant set forth repeated instances of misrepresentations, concealment of material facts and other fraudulent conduct in which defendants and their associates at SMC engaged. The affidavits identified a number of SMC salesmen or principals who participated in deceptive high pressure sales techniques and enumerated many unauthorized transfers of customer funds from one commodity pool to another to generate large commissions or management fees. We find these facts provided probable cause to believe SMC was a "boiler room" operation that was permeated with fraud and that this fraud affected *all* SMC's customers, not just the twenty-five specifically described. Fraudulent conduct in twenty-five separate instances made it probable that SMC sales personnel used identical deceptive and misleading sales techniques with other investors. *See Brien*, 617 F.2d at 308 (similarity in sales techniques reported by 250 complaints showed evidence of a scheme to defraud). Similarly, the government here had no obligation to restrict the search to specific documents where the evidence, detailed fully in the accompanying affidavits, demonstrated widespread efforts to defraud customers through a varie-

---

**15.** The warrant authorized the search and seizure of the following records and documents: banking records, cancelled checks, cash receipt and disbursement records, sales literature, customer files, customer lists, personnel files, employee compensation records and withholding tax forms, financial records, sales training material, written sales pitches or scripts, lead cards, tape recordings relating to sales and compliance and logs thereof, taping scripts, results of polygraph tests taken by personnel and test forms, compliance, training and account executive manuals, written notification of complaints and responses thereto, memoranda or other written records of conversations with customers, calendars, diaries and correspondence relating to business, mail, telegram, mailgram, wire transfer records, and computer records or printouts relating to customer accounts, which are evidence and fruits of, and the means of commission of violations of Title 18, U.S.Code, Sections 1341, 1343, 371 and violations of the Commodity Exchange Act, Title 7, U.S.Code, Section 6(b) 60(1).

ty of misleading disclosures and representations.

Thus, based on the pattern of illegal conduct in evidence at SMC, we hold the search warrant described items to be seized with sufficient particularity to meet the requirements of the Fourth Amendment.

### 2. Execution of the Search Warrant

Bloch also argues that as a result of the allegedly overbroad search warrant, the FBI agents had unlimited discretion and engaged in a general exploratory search in violation of the fourth amendment. He claims that the executing agents "simply seized everything existing on the premises," including entire file cabinets and boxes filled with documents.

■■■■ The magnitude of the search, however, is not sufficient to establish a constitutional violation. *Wuagneux*, 683 F.2d at 1352. Instead, the search "may be as extensive as reasonably required to locate and seize items described in the warrant." *Id.* The reasonableness of the search depends upon the complexity of the crime being investigated and the difficulty involved in determining whether certain documents evidence fraud. *Id.*

■■■■ Here, the record shows executing agents carefully confined the search to the scope of the warrant. Initially, the FBI case agent instructed the executing agents that personal records of individuals and other businesses may be on the premises and should not be seized. Moreover, during the search, the case agent did review items seized and determined a quantity of records reviewed were not those of SMC and left them on the premises. Also, SMC employees were allowed to segregate and remove their personal items. Finally, the documents seized consisted only of business records likely to reveal a pervasive scheme to defraud investors as specified in the warrant. Accordingly, we find the execution of the warrant did not violate the fourth amendment.

### VIII. BLOCH'S GUILTY PLEA

Bloch also moves to withdraw his guilty plea as involuntary pursuant to Fed.R.

Crim.P. 32(d). He alleges that the trial judge induced him to enter his conditional plea of guilty by promising that his motion to suppress evidence would be heard at an evidentiary hearing, when, in fact, no hearing was ever held.

■■■ After sentencing, a plea may be set aside only on direct appeal or by motion under 28 U.S.C. § 2255 (1982). A defendant has the burden of proving that to allow his plea to stand would result in "manifest injustice." *United States v. Lake,* 709 F.2d 43, 45 (11th Cir.1983).

■■■ Having carefully reviewed the entire record of the guilty plea proceedings we are satisfied that Bloch entered his plea voluntarily and that he did not act under the misapprehension that his plea was contingent upon a hearing. We find the following colloquy between the trial judge and Bloch demonstrates that his plea was subject only to the condition that he would have a right to appeal a denial of his motion to suppress evidence:

THE COURT: I Have approved and the Government has consented for you to enter a conditional plea of guilty.

What that means simply is this: Your attorney has filed a motion to suppress certain evidence, and that motion will be heard by the Court.

If there should be an adverse ruling by the Court and the motion is denied—in other words, you would have received a ruling adverse to your contentions—that specific ruling may be appealed.

I am not approving anything else but that.

Do you understand that, sir?

You have a little hesitancy. Do you want me to go over it again?

THE DEFENDANT: I follow it.

THE COURT: What they are doing is, rather than closing the whole ball game and we walk out, one thing is being retained for appellate purposes—if I rule adversely to you—that is, the motion to suppress.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: But only that.

THE DEFENDANT: Yes.

Bloch never requested, nor did the court promise that an evidentiary hearing would be held or indicate it would follow any specific procedure in ruling on his motion. We, therefore, find Bloch has failed to establish the requisite "manifest injustice" that would entitle him to withdraw his guilty plea.

## IX. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.